Opinion
 

 WISEMAN, J.
 

 In this double homicide case, we address a finding by the trial court which suggests the police arrested defendant for a murder which both sides agree was unsupported by probable cause. Although the trial court’s findings are ambiguous, we conclude defendant’s motion to suppress was properly denied since there was ample probable cause to arrest defendant on the second, unrelated homicide. Contrary to defendant’s position, there is no requirement that the offense upon which the police make an arrest be “related” to the offense for which probable cause to arrest is found to exist.
 

 We further determine that just because a trial court instructs a jury on perfect self-defense, this does not necessarily mean it has a sua sponte duty
 
 *1255
 
 to also instruct on
 
 imperfect
 
 self-defense. Defendant’s case well illustrates the wisdom of this holding since even on appeal defendant fails to articulate what evidence supports the giving of an imperfect self-defense instruction. A review of the record reveals defendant received a windfall by convincing the court to instruct on
 
 perfect
 
 self-defense. He cannot now be heard to complain because the court did not instruct on imperfect self-defense since this theory is unsupported by the evidence.
 

 Procedural History
 

 By information filed on March 24, 1994, defendant was charged with two counts of murder pursuant to Penal Code
 
 [1]
 
 section 187. Count 1 alleged defendant murdered Jimmy Contreras with the use of a firearm (§ 12022.5, subd. (a)) and while lying in wait (§ 190.2, subd. (a)). Count 2 alleged defendant murdered John Henry Moore with the use of a deadly weapon, a knife (§ 12022, subd. (b)). It was alleged with respect to both counts that defendant committed multiple murders within the meaning of section 190.2, subdivision (a)(3).
 

 Defendant pled not guilty and moved to sever the respective counts. Defendant’s motion to suppress evidence pursuant to section 1538.5 and his motion to sever were both denied. The court also denied defendant’s motions to suppress his confession and to strike the special circumstances.
 

 Following a jury trial, defendant was found guilty on count 1 of first degree murder with the personal use of a firearm committed while lying in wait. On count 2, the jury found defendant guilty of second degree murder, and that he used a deadly weapon. The multiple-murders special-circumstance allegation was found true.
 

 At the conclusion of the trial’s penalty phase the jury returned a verdict of life without possibility of parole.
 

 On August 10, 1995, defendant was sentenced to state prison for life without the possibility of parole. That sentence was enhanced by five years for the firearm use, fifteen years to life on count 2, and two years for the deadly weapon use.
 

 Timely notice of appeal was filed.
 

 Factual History
 

 The salient facts are not in dispute. The charges stem from homicides committed on different dates.
 

 
 *1256
 

 The Moore homicide—count 2
 

 Around 5 a.m. on December 13, 1993, Lashonda Moore (Lashonda) arrived at room 220 of the Royale Palms Motel, located in Kern County, where her estranged husband, John Moore (Moore), lived. Moore was not there; however, defendant, whom Lashonda knew only as “George,” and a woman named “Poochie” were inside the room. Lashonda sat with defendant and Poochie, and waited for Moore to arrive.
 

 About 6:30 a.m., Moore returned to the room “under the influence of something.” At some point, Moore stated he had dropped $2 and wondered who picked it up. He began to question defendant and Poochie about the money. Lashonda told Moore she had almost $2 in change and offered it to him. Moore reacted angrily and struck Lashonda with his open hand. She fell, and Moore got on top of her. Defendant tried to stop Moore, and told him not to hit Lashonda. Moore got off Lashonda and began arguing with defendant. Moore and defendant began to struggle. It appeared to Lashonda that defendant was getting the best of Moore.
 

 At some point during the struggle, Moore obtained a butcher knife from the bathroom and slashed defendant across the face with it. Ultimately, Lashonda and Poochie convinced Moore to release the knife and separated him from defendant. Defendant was bleeding heavily from his face and appeared to be in pain.
 

 After walking downstairs and throwing the knife in the trash, Lashonda joined defendant and Poochie. The three left the room together.
 
 [2]
 
 After departing, defendant told Lashonda he could not believe Moore had stabbed him. He told Lashonda more than once that she should not go back to the room. “Don’t be there because he’s not going to live any more [sic].” Defendant also told her he was going to go get one of his “homeboys.” When Lashonda pleaded that defendant not do anything, defendant said, “well, once they see my face, you know, I ain’t going to be able to do anything about that.”
 

 A detailed description of the ensuing events leading to the death of Moore is contained in part II.D. of this opinion.
 

 
 *1257
 

 The Contreras homicide—count 1
 

 On January 24, 1994, Elnora Preston lived in an apartment complex located at 5000 Belle Terrace in Bakersfield. About 1 a.m., Preston’s husband went to his car while Preston watched from her balcony. A man wearing all black approached her husband, asked for matches, and lit a marijuana cigarette.
 

 Around 7 o’clock that same morning, the same man in black knocked on Preston’s door and gave his name as “George.” Preston later identified this man as defendant. Defendant asked if she knew where “Jimmy” lived, and she replied she did not.
 
 [3]
 

 Jessica Shaffer lived in apartment No. 186 of the same apartment complex, which she shared with Jimmy Contreras (Contreras). Shortly after 4 p.m. on January 24, she heard a “pop” outside her apartment, followed by Contreras’s voice calling her for help. She found Contreras sitting at the top of the stairs, in front of their apartment door. As she approached him, she saw a man in dark pants and a dark hooded sweatshirt halfway down the stairs. This man pointed and fired a gun in their direction, and left. Shaffer assisted Contreras into the apartment and shut the door. Suddenly, the same man broke through the glass panel adjacent to the door, leaned in with a handgun, and shot Contreras in the face.
 

 A subsequent autopsy determined Contreras sustained two gunshot wounds, the one to his left shoulder being fatal.
 

 Latent fingerprints from the glass panel to the apartment shared by Shaffer and Contreras matched defendant’s fingerprints. Defendant’s fingerprints were also found on the glass panel outside vacant apartment No. 202.
 

 Defendant’s statements to police
 

 Defendant was arrested in the late evening of January 25, 1994, waived his constitutional rights, and gave statements to police.
 

 Regarding the Moore case, defendant stated that during his first altercation with Moore, Moore obtained a knife and stabbed him in the face. He denied having made any threats to Lashonda, after they left the room, to return and kill Moore.
 

 
 *1258
 
 Defendant called his friend, Raul Moran, who picked him up, and they then picked up Lashonda. All three went to Moore’s room to try to retrieve defendant’s wallet. Lashonda was unsuccessful in getting the wallet, so they dropped her off, obtained the room key from her, and returned to Moore’s room. When he entered the room with Moran, defendant was confronted by Moore. Moore went to get a knife and they struggled. Moore came at defendant and fell on the knife, at which point defendant stabbed Moore more than once.
 
 [4]
 
 Defendant stated he was afraid of Moore, and he stabbed him in self-defense. Defendant and Moran ran from the room and drove away.
 

 Regarding the Contreras case, defendant stated he had known Contreras for about two years, during which Contreras regularly humiliated him in front of defendant’s friends. About two months before his death, Contreras had beaten him in front of defendant’s friends. On the Saturday before Contreras’s death, which occurred on a Monday, Contreras asked defendant to obtain some methamphetamine for him while both were in a motel room with a friend of defendant. When defendant refused, Contreras told him, “you do not want to become my enemy.” Defendant perceived this statement as a threat against his life, and left. After this incident, defendant made his decision to kill Contreras.
 

 Defendant obtained a gun from a friend on Sunday, put on some dark clothing, and went to Contreras’s apartment complex. Defendant stayed at the apartment complex through Monday looking for Contreras, asking residents where he could find Contreras.
 

 Eventually, defendant saw Contreras arrive at the complex and approached him. Defendant told him he had obtained the drugs. Contreras appeared pleased and invited defendant to his apartment. As Contreras arrived at the top of the stairs, he looked back. Defendant withdrew the handgun he had secreted in his waistband and shot Contreras in his face. Contreras fell and yelled for his girlfriend. Defendant began to flee, but fired again as Contreras’s girlfriend tried to help him up. Defendant was concerned that Contreras would retaliate, so he went back up, broke a glass panel with his foot, and fired another shot at Contreras.
 

 Defense
 

 Defendant did not testify. He called several witnesses to testify to his reputation as a peaceful, nonviolent man, and to the reputations of both victims for violence.
 

 
 *1259
 
 Discussion
 

 I.
 
 The trial court properly denied the motion to suppress evidence.
 

 Defendant contends the trial court erred by denying his section 1538.5 motion to suppress evidence. His motion alleged, among other things, an unlawful warrantless arrest based on a lack of probable cause to arrest him for the murder of Contreras.
 

 A.
 
 Factual summary
 

 On January 25, 1994, Detective Boggs of the Bakersfield Police Department (BPD) was investigating the homicide of Contreras. On that evening, Boggs received an anonymous phone call identifying “Jorge Rodriguez” as the perpetrator of the homicide. Boggs recognized the name as that of a suspect in a Kern County Sheriff’s Department (KCSD) homicide investigation. Boggs heard about the KCSD investigation from recent interdepartmental briefings and conversations with Detective Fidler of the KCSD, who was conducting the investigation. Boggs had learned from Fidler that a witness had identified defendant as the perpetrator of a stabbing homicide at a motel.
 

 After receiving the anonymous call, Boggs contacted the KCSD and spoke to Sergeant Glenn Johnson, who confirmed the KCSD investigation of defendant was still active. Johnson, who was then in charge of Fidler’s detail, told Boggs the complaint had been submitted to the district attorney’s office, and would be issued. Boggs determined the location of defendant’s residence.
 

 At approximately 11:30 that evening, officers from both the KCSD and the BPD, including Boggs, went to defendant’s residence and arrested him. Defendant was placed in a patrol car and transported to the BPD where he was photographed and fingerprinted. After being advised of his
 
 Miranda
 

 [5]
 

 rights, defendant waived them and indicated his willingness to discuss both homicide investigations, but insisted on talking about the KCSD case first.
 

 Sometime later that night, Boggs spoke to Fidler, advised him defendant was in custody, and that defendant had been arrested on both cases. Fidler and Detective Raymond subsequently went to the police station and also interviewed defendant.
 

 Fidler testified that during his investigation of Moore’s homicide, when Lashonda was shown defendant’s driver’s license with defendant’s photograph on it, she identified defendant as the killer. Prior to being shown the
 
 *1260
 
 license photo, Lashonda had identified defendant only as “George." The defendant’s driver’s license was found in Moore’s pocket. Lashonda told Fidler that defendant and Moore had been involved in a fight on the same day as the homicide in the motel room where Moore’s body was found. After the altercation, defendant told Lashonda “once his homeboy saw his injury that they [sic] would not like it and that her husband was going to die for it.” Lashonda also stated she saw defendant with a knife that day.
 

 After completing his investigation, Fidler submitted a complaint package to the district attorney’s office around the first of January, and requested the issuance of homicide charges against defendant. Fidler corroborated Boggs’s testimony that Fidler had discussed the Moore homicide with Boggs at the weekly interdepartmental briefings prior to January 24, 1994.
 

 In the early morning hours of January 26, Fidler was advised by Sergeant Johnson that defendant had been arrested by the BPD for a homicide which occurred in BPD jurisdiction. Later that morning, Fidler spoke with Boggs and informed him defendant had been arrested on the BPD case.
 
 [6]
 

 B.
 
 The trial court’s ruling
 

 Defense counsel argued Boggs had no probable cause to arrest defendant for the Contreras homicide. He contended Boggs was attempting to justify the arrest based on the information he had about the Moore homicide. The defense argued defendant’s statements, made after his arrest without probable cause, were the product of an illegal arrest. The prosecution conceded there was no probable cause to arrest defendant for the Contreras homicide. Instead, the prosecutor argued it made no difference whether Boggs subjectively believed he was arresting defendant on the Contreras case since he had probable cause to arrest him on the Moore case. The prosecutor contended that if the information Boggs had prior to the arrest was viewed from an objective standpoint, defendant’s arrest was supported by probable cause. The prosecutor also noted the fact Boggs double-checked with Sergeant Johnson before arresting defendant showed he relied, at least in part, on the KCSD case.
 

 The court denied the motion to suppress after making the following findings and rulings on this issue: “I do find now that Officer Boggs arrested him and in arresting him on the City case was arresting him on the case in which he did not have probable cause to arrest him for but that he did possess articulable facts which he has articulated for us which would have
 
 *1261
 
 justified his arrest for the County homicide, the Moore case. And that consequently, the arrest was a lawful arrest.”
 

 C.
 
 Standard of review
 

 The applicable standard of review is as follows: “In reviewing the denial of a motion to suppress evidence, we view the record in the light most favorable to the trial court’s ruling and defer to its findings of historical fact, whether express or implied, if they are supported by substantial evidence. We then decide for ourselves what legal principles are relevant, independently apply them to the historical facts, and determine as a matter of law whether there has been an unreasonable search and/or seizure. [Citation.]”
 
 (People
 
 v.
 
 Miranda
 
 (1993) 17 Cal.App.4th 917, 922 [21 Cal.Rptr.2d 785].)
 

 In denying the motion to suppress, the trial court made express findings as quoted earlier. However, the findings are ambiguous and, as a result, the parties disagree on what the court actually found. Defendant contends the court found Boggs arrested defendant
 
 only
 
 on the Contreras case, and not on the Moore case. The People contend the court’s finding is consistent with Boggs’s testimony that he arrested defendant on
 
 both
 
 cases. Since the court’s finding is ambiguous, both parties find partial support for their respective arguments.
 

 There is no finding defendant was
 
 not
 
 arrested on the Moore homicide, or that the court disbelieved Boggs’s testimony in this regard. (“Boggs arrested him and in arresting him on the City case was arresting him on the case in which he did not have probable cause.”) On the other hand, there is also no finding Boggs arrested defendant on the Moore case, only that he articulated probable cause “which would have justified” such an arrest.
 

 While the court’s wording makes it appear the court impliedly found Boggs arrested defendant only on the Contreras case, the evidence was uncontradicted that Boggs arrested defendant on
 
 both
 
 cases. First, Boggs testified that before making the arrest, he checked with Sergeant Johnson regarding the status of the Moore investigation. Secondly, he testified the arrest was conducted jointly with KCSD officers. Finally, he testified he told Fidler later that morning he had arrested defendant on his own case and in Fidler’s case. None of this testimony was contradicted by any evidence. While Fidler corroborated Boggs’s testimony to the extent Boggs had informed Fidler he had arrested defendant on the BPD case, no one asked Fidler whether Boggs also told him he had arrested defendant on Fidler’s case as well.
 

 Even without contradiction, the court could have disbelieved Boggs’s testimony and rejected the notion defendant was arrested on the KCSD case.
 
 *1262
 
 However, the court’s statements do not specifically make such a finding. Given the court’s findings, we could infer the court did reject Boggs’s testimony regarding a simultaneous arrest on both cases. On the other hand, by denying defendant’s motion to suppress, any implied findings must be viewed in favor of the trial court’s ultimate ruling, which favored the People.
 

 Having recognized the ambiguity in the court’s findings, we decline to further address this factual question since it does not affect our decision’s outcome.
 

 D.
 
 Analysis
 

 The issues are narrowly defined. Both sides agree there was no probable cause to arrest defendant on the Contreras case, but there was probable cause to arrest him on the Moore case.
 

 If the trial court believed Boggs arrested defendant on both cases, there is no question the arrest was lawful, even though Boggs mistakenly believed he had probable cause to arrest on the Contreras case. (See
 
 People
 
 v.
 
 Goldberg
 
 (1984) 161 Cal.App.3d 170, 179 [207 Cal.Rptr. 431] [The fact the defendant was arrested for extortion, which was not supported by probable cause, as well as for receiving stolen property, which was supported by probable cause, was of no consequence.].) However, even if the trial court believed Boggs only arrested defendant on the Contreras case, the arrest was still valid because Boggs had probable cause to arrest defendant on the Moore case. (See
 
 People
 
 v.
 
 Lewis
 
 (1980) 109 Cal.App.3d 599 [167 Cal.Rptr. 326].)
 

 In
 
 Lewis,
 
 the defendant was found asleep in a motel room he had not rented. The officer arrested the defendant for burglary, believing he had entered the room to commit a felony. The Court of Appeal rejected defendant’s claim there was insufficient evidence to arrest him, stating:
 

 “Appellant’s claim that the evidence elicited at this hearing was not such as to provide probable cause to arrest is without merit. There is probable cause to arrest when the facts known to the arresting officer would lead a person of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that an individual is guilty of a crime. [Citation.] The standard of probable cause to arrest is the probability of criminal activity, not a prima facie showing. [Citation.] Officers Anderson and Jones had probable cause to believe that a crime had been committed—an unregistered person was sleeping in one of the rooms, from the bathroom window of which the louvres had been removed; he had no identification and an unsatisfactory explanation for being there. The prior
 
 *1263
 
 occupant to whom the room had been rented requested another room. This constitutes substantial evidence to support the finding of the trial court.
 

 “. . . It is apparent that probable cause to arrest appellant existed. The facts adverted to above are such as to permit an officer to reasonably entertain the suspicion that appellant intended either to take property belonging to the room’s occupant or to obtain the benefit due to a hotel guest without paying for it—use of the room. Penal Code section 537 provides that any person who obtains accommodations at a [motel] without paying therefor, with intent to defraud the proprietor or manager of the establishment, is guilty of a misdemeanor. Thus, even if Officer Anderson did not have probable cause to arrest defendant for burglary, he did for this latter offense. ‘The fact the officer did not formally place appellant under arrest for that offense did not invalidate the arrest or require exclusion of the evidence seized incident to the arrest [citations].’ ”
 
 (People
 
 v.
 
 Lewis, supra,
 
 109 Cal.App.3d at pp. 608-609.)
 

 The
 
 Lewis
 
 court relied on
 
 In re Donald L.
 
 (1978) 81 Cal.App.3d 770 [146 Cal.Rptr. 720], which held, at page 775: “The fact an officer may place a person under arrest for the wrong offense does not invalidate the arrest and require exclusion of evidence seized incident to the arrest, if the officer nevertheless had probable cause to arrest the person for another offense.”
 

 In
 
 Donald L.,
 
 the police responded to a call of a suspicious person. While driving in the area of the report, the officer observed the minor, who fit the description he had received. As the officer approached the minor, he observed him carrying some kind of instrument, which turned out to be a billy club. In a patdown search, the officer found several pieces of jewelry in the minor’s pocket. He arrested the minor for suspicion of burglary. The minor complained the arrest was unlawful because there was insufficient probable cause to arrest him for burglary. The Court of Appeal rejected this contention because the officer nonetheless had probable cause to arrest the minor for unlawful possession of a billy club or blackjack.
 
 (In re Donald L., supra,
 
 81 Cal.App.3d at p. 775.)
 

 Defendant attempts to distinguish these cases on the ground the offense on which the officer arrested must be “related” to the offense on which probable cause to arrest is found to exist. Under this reasoning, defendant contends his arrest was unlawful because the Contreras homicide was not related to the Moore homicide. Defendant principally relies on
 
 Agar
 
 v.
 
 Superior Court
 
 (1971) 21 Cal.App.3d 24 [98 Cal.Rptr. 148] for this proposition.
 

 In
 
 Agar,
 
 the defendant was stopped and arrested for reckless driving. At the time of the initial detention, the defendant’s passenger threw a baggie of
 
 *1264
 
 marijuana out his window. Anticipating the search following the reckless driving arrest would not be upheld, the People advanced certain theories, for the first time on appeal: “[T]he People seem to make either one, or both, of the following contentions: first, the right to book existed because there would have been probable cause to support an arrest for possession of the baggie had such an arrest been made; second, notwithstanding the fact that petitioner was told he was being arrested for reckless driving, and notwithstanding the fact that petitioner was booked for reckless driving, petitioner was actually arrested and booked for possession of the baggie.”
 
 (Agar
 
 v.
 
 Superior Court, supra, 21
 
 Cal.App.3d at p. 28.)
 

 The court noted the People overlooked the requirement that the police officer believed the crime of possession of marijuana was committed by the defendant. The court then rejected the People’s first contention as follows: “Here, it is clear that this court is not called upon to decide the reasonableness of a belief on the part of the officer that petitioner was a co-possessor of the baggie, because the record is devoid of even the slightest suggestion that the officer entertained such a belief. The record discloses that petitioner had been arrested for ‘reckless driving’ (not for possession of the baggie), and that petitioner had been booked for ‘reckless driving’ (not for possession of the baggie). Even the most tortuous interpretation of the facts before us fails to establish that the arresting officer ever
 
 suspicioned
 
 that petitioner had been in either personal or joint possession of the baggie. Since there is
 
 no
 
 evidence that the officer envisioned that petitioner possessed the baggie, it becomes illogical for us to analyze whether such a contemplation would have been reasonable had it been entertained; since there is no evidence that the officer ever contemplated (or if he did, formed a belief) that petitioner possessed the baggie, the officer lacked lawful grounds to arrest for possession of the baggie, and, absent a lawful arrest, the subsequent booking procedure and search were illegal.”
 
 (Agar
 
 v.
 
 Superior Court, supra, 21
 
 Cal.App.3d at p. 30.)
 

 The court also rejected the People’s second contention, which relied on cases holding an arrest is not invalidated simply because the officer makes a mistake in stating the legal basis for the arrest. The court held:
 

 “In each case cited by the People and in each of the cases which our own research has disclosed, the reason given by the officer for the arrest-and-booking is intimately related to the subsequent charge for which the accused was prosecuted. Here, if we were being asked to uphold a charge of ‘speed contest,’ we might agree, but under no interpretation of the facts before us could it be said that an arrest (and wrongful booking) for reckless driving is related to an arrest (and legal booking) for illegal possession of marijuana.
 

 
 *1265
 
 “Accordingly, we conclude that there was no valid arrest of petitioner for possession of the baggie. . . .”
 
 (Agar
 
 v.
 
 Superior Court, supra,
 
 21 Cal.App.3d at pp. 31-32, fn. omitted.)
 

 Agar
 
 is easily distinguishable from the instant case because the record amply supports the fact Boggs believed he had probable cause to arrest defendant for the Moore homicide. He testified unequivocally to this effect. Further, his belief is circumstantially supported by Boggs’s actions prior to making the arrest, i.e., he contacted the KCSD to get an update on their Moore investigation, and he had members of the KCSD present to assist in making the arrest.
 

 If we assume defendant’s position is correct, and Boggs only arrested defendant for the Contreras homicide, Boggs still
 
 subjectively
 
 believed he had probable cause to arrest defendant for the Moore homicide. It is Boggs’s subjective belief, measured by an objective standard for probable cause, that
 
 Agar
 
 requires. In
 
 Agar,
 
 there was no evidence the arresting officer subjectively believed the defendant was in possession of marijuana. Simply stated, the People were advancing a new theory justifying the arrest for the first time on appeal. In contrast, as previously mentioned, there is ample evidence to support a finding that Boggs subjectively believed there was probable cause to arrest defendant for the Moore homicide. Since Boggs relied, at least in part, on his belief that defendant also committed the Moore homicide,
 
 Agar
 
 has no application. Thus, there is no need to find the homicides were somehow “related” in order to hold the arrest was valid.
 

 The only remaining question is whether Boggs’s suspicion defendant committed the Moore homicide is objectively reasonable. As previously noted, there is no meaningful dispute that the facts articulated by Boggs meet the objective standard for probable cause. Therefore, whether Boggs may have only arrested defendant for the Contreras homicide is immaterial, and does not invalidate the arrest. Unlike
 
 Agar,
 
 this is not a case where the People have asserted a new theory on appeal or have tried to justify the arrest on grounds which did not occur to the arresting officers at the time of the arrest. (See
 
 Green
 
 v.
 
 Superior Court
 
 (1985) 40 Cal.3d 126, 137 [219 Cal.Rptr. 186, 707 P.2d 248], and cases cited.)
 

 In addition, recent case law has brought into question the continuing validity of
 
 Agar.
 
 In
 
 Whren
 
 v.
 
 U.S.
 
 (1996) _ U.S. _ [116 S.Ct. 1769, 135 L.Ed.2d 89], a police officer in an unmarked car made a U-turn after observing a truck (with temporary license plates and youthful occupants) stopped at an intersection for over 20 seconds. When the officer headed toward the truck, it turned suddenly to its right without signaling, and sped
 
 *1266
 
 off at an “ ‘unreasonable’ ” speed.
 
 (Id.
 
 at p— [116 S.Ct. at p. 1772].) After pulling up alongside the truck, one officer got out of his vehicle, and approached it. After identifying himself as a police officer, the officer observed two large plastic bags of what appeared to be crack cocaine in the defendant’s hands. He was arrested.
 
 (Ibid.)
 

 The defendant conceded the officer had probable cause to believe a traffic violation had occurred. He argued, however, the normal test for probable cause should not apply to traffic stops. Instead, he urged the test should be “whether a police officer, acting reasonably, would have made the stop for the reason given.”
 
 (Whren
 
 v.
 
 U.S.,
 
 supra,_U.S. at p._[116 S.Ct. at p. 1773].) The United States Supreme Court discussed several cases which establish an officer’s motive does not invalidate objectively reasonable behavior under the Fourth Amendment. One of the cases discussed was
 
 United States
 
 v.
 
 Robinson
 
 (1973) 414 U.S. 218 [94 S.Ct. 467, 38 L.Ed.2d 427], in which the court had held a traffic violation arrest was not rendered invalid by the fact it was a pretext for a narcotics search. The court stated: “We think these cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. . . . Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.”
 
 (Whren
 
 v.
 
 U.S., supra,
 
 U.S. at p. _ [116 S.Ct. at p. 1774].)
 

 The
 
 Whren
 
 case was concerned with whether the ulterior motive of a police officer is a factor in applying the probable cause test. It did not address whether an officer’s “subjective belief in probable cause to arrest” is a factor in the test for probable cause. Nonetheless, the traditional probable cause test under the Fourth Amendment has no subjective intent element which must be satisfied to validate an arrest. Even the
 
 Agar
 
 court recognized “that
 
 probable cause
 
 is measured by an objective standard and not by a subjective standard.”
 
 (Agar
 
 v.
 
 Superior Court, supra,
 
 21 Cal.App.3d at p. 29.) In light of
 
 Whren,
 
 we decline to follow
 
 Agar
 
 to the extent it holds a police officer’s belief is part of the test for probable cause. (See
 
 People
 
 v.
 
 Souza
 
 (1994) 9 Cal.4th 224, 232-233 [36 Cal.Rptr.2d 569, 885 P.2d 982] [after Prop. 8, enacted in 1982, relevant evidence may not be excluded unless it is required by the U.S. Constitution].)
 

 As noted by the
 
 Whren
 
 court, the test is not whether a reasonable officer would have made the arrest for the reasons given. Instead, the traditional common law rule that probable cause justifies a seizure must be applied. This is the test the trial court applied when it found Boggs had articulated facts regarding the Moore homicide which justified his arrest of defendant. Thus, whether Boggs believed he was arresting defendant only on the
 
 *1267
 
 Contreras case or on both the Contreras and Moore cases, the arrest was valid because it was supported by probable cause to believe defendant had committed
 
 a
 
 homicide. Lastly, since Boggs articulated facts establishing probable cause for the arrest of defendant in the Moore homicide, it is irrelevant whether the Moore homicide was “related” to the Contreras homicide.
 

 Defendant’s motion to suppress based on the theory of an invalid arrest was properly denied.
 

 II.
 
 The trial court did not err by refusing to instruct on the theory of an honest but unreasonable belief in self-defense.
 

 Defendant contends the trial court erred by refusing to instruct the jury on the defense theory of an honest but unreasonable belief in self-defense, a consideration of which could have negated the existence of the mental state of malice aforethought. (See
 
 People
 
 v.
 
 Flannel
 
 (1979) 25 Cal.3d 668, 672 [160 Cal.Rptr. 84, 603 P.2d 1]; CALJIC No. 5.17.) We disagree.
 

 A.
 
 The procedural setting
 

 As previously noted, the offenses charged in counts 1 and 2 arose from separate incidents which occurred over a month apart. Regarding count 1 (Contreras homicide), the defense advised the court, “Our side of the case as far as Mr. Contreras is concerned is imperfect self-defense and/or killing in the heat of passion, which may be brought about by a long period of time.” Thus, the defense requested an instruction pursuant to CALJIC No. 5.17 or a modification of that instruction
 
 [7]
 
 on its theory of “imperfect self-defense.” The prosecutor opposed this instruction on the ground there was no evidence that defendant believed Contreras was an imminent threat to him at the time defendant shot him. The prosecutor relied on the case of
 
 In re Christian S.
 
 (1994) 7 Cal.4th 768 [30 Cal.Rptr.2d 33, 872 P.2d 574]. The following colloquy occurred:
 

 “I think that would arguably—do have the defendant saying here, I have a fear of future harm by Mr. Contreras. But prospective harm, I don’t see how the evidence presented provides any fear of imminent peril to him at the time
 
 *1268
 
 that he contacts Mr. Contreras and at the time of the shooting, which is when he has to have that fear. In other words, at the time he shoots Mr. Contreras for the instruction on Flannel theory, imperfect self-defense, to be appropriate, he has to feel that Mr. Contreras is going to seriously injure or kill him right then and there. And I don’t think that we have evidence of that. I think we have evidence that he feared it might happen at some point in the future and, therefore, essentially acted preemptively to prevent that possible future harm. But based on Christian S., I don’t think that justifies voluntary manslaughter instruction or verdict on that theory.
 

 “The Court: Mr. Boyle.
 

 “Mr. Boyle [defense counsel]: I believe that we are entitled to instruct —an instruction upon our defense theory regardless of whether that is voluntary manslaughter or involuntary manslaughter, whatever it is, because the failure to give a defense requested instruction as to his side of the case is error of Constitutional dimensions violative of Article 15 and 16 of the Federal, Sixth and 14th Amendments, the right to trial by jury. I believe that we are entitled to have the instruction on imperfect self-defense. I believe we are entitled to have an instruction that allows the jury, if they believe the evidence that has come in, and they believe that the verdict should be voluntary manslaughter, then I believe that they are entitled to so find. I don’t think that they—I think it is violative of the defendant’s right to compel the jury to find a certain way, that is, to say you cannot find involuntary manslaughter, you must find first degree murder or second degree murder on an imperfect self-defense theory.
 

 “The Court: Well, I don’t buy that argument at all so far as the Constitutional argument is concerned. The defendant is not entitled to any instruction that can’t be justified by the facts.
 
 What facts are we looking at? Not what facts we would draw, but what facts any reasonable juror could draw from the evidence that’s been presented here in court.”
 
 (Italics added.)
 

 Defense counsel bypassed the court’s narrow question regarding what facts, if any, supported an honest but unreasonable belief in self-defense. Instead, counsel argued the evidence supported an argument that defendant had a sudden passion building up over time based on his confrontational history with Contreras. The prosecutor conceded the jury should be instructed on voluntary manslaughter with respect to the Contreras homicide on a heat of passion theory. “But I don’t think the imperfect self-defense theory is there based on any evidence . . . because the inference created by [defendant’s] statement, if an inference of a threat to life is created is one of future or prospective harm and under Christian S. that doesn’t justify the
 
 *1269
 
 instruction.” The court agreed, and ruled it would not give CALJIC No. 5.17 unless the defense could come up with something else. The defense made no further effort to justify giving the requested instruction.
 

 B.
 
 Applicable rules for appellate review
 

 In
 
 People
 
 v.
 
 Flannel, supra, 25
 
 Cal.3d 668, the court explained the difference between murder and manslaughter. Murder is defined as the unlawful killing of a human being with malice aforethought, and manslaughter is defined as the unlawful killing of a human being without malice aforethought. (See §§ 187, subd. (a) & 192.) The court stated the honest belief of imminent peril negates malice in a case of perfect self-defense, and the reasonableness of the belief goes to the justification for the killing.
 
 (People
 
 v.
 
 Flannel, supra, 25
 
 Cal.3d at p. 679.) The court further explained: “An honest but unreasonable belief that it is necessary to defend oneself from imminent peril to life or great bodily injury negates malice aforethought, the mental element necessary for murder, so that the chargeable offense is reduced to manslaughter.”
 
 (Id.
 
 at p. 674, italics omitted.) Regarding the duty to give requested instructions, the court held the trial court is required to instruct if the defendant presents substantial evidence to support a theory of defense, i.e., enough to deserve consideration by the jury. “If the evidence should prove minimal or insubstantial, however, the court need not instruct on its effect.”
 
 (Id.
 
 at p. 684.)
 

 In
 
 In re Christian S., supra, 1
 
 Cal.4th 768, the court held statutory changes in the law had not affected the vitality of the
 
 Flannel
 
 defense. The court, however, provided the following caveat:
 

 “We caution, however, that the doctrine is narrow. It requires without exception that the defendant must have had an
 
 actual
 
 belief in the need for self-defense. We also emphasize what should be obvious. Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant’s fear must be of
 
 imminent
 
 danger to life or great bodily injury. ‘ “[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future.
 
 An imminent peril is one that, from appearances, must be instantly dealt with.”
 
 ...[*][] This definition of imminence reflects the great value our society places on human life.’ [Citation.] Put simply, the trier of fact must find an
 
 actual
 
 fear of an
 
 imminent
 
 harm. Without this finding, imperfect self-defense is no defense.
 

 “. . . Finally, we reiterate that, just as with perfect self-defense or any defense, ‘[a] trial court need give a requested instruction concerning a
 
 *1270
 
 defense
 
 only if there is substantial evidence to support the defense.
 
 ’ [Citation.]”
 
 (In re Christian S., supra, 1
 
 Cal.4th at p. 783.)
 

 C.
 
 Application of the law to this case
 

 On
 
 appeal, defendant continues to fail to answer the pertinent inquiry made by the trial court—what substantial evidence supports the
 
 Flannel
 
 theory of defense? Even on appeal, defendant makes no effort to answer the question except to argue: “[Defendant] submits that the only factor distinguishing ‘complete’ self-defense from ‘imperfect’ self-defense is the reasonableness of the belief in the right to defend. Accordingly, in any case in which there is sufficient evidence to warrant instructions on ‘complete’ self-defense, there is sufficient evidence to warrant instructions on ‘imperfect’ self-defense, where there is an issue as to the ‘reasonableness’ of the asserted belief.”
 

 Defendant does not indicate what evidence supposedly warranted self-defense instructions, let alone an imperfect self-defense instruction. It is true, as defendant points out, “where there is an issue as to the ‘reasonableness’ of the asserted belief’ in self-defense, the
 
 Flannel
 
 instruction should be given. However, defendant does not expressly state this case actually does raise an issue concerning reasonableness. Further, he fails to articulate what evidence raised the issue of reasonableness.
 

 In our view, there is no substantial evidence to support the giving of perfect self-defense instructions regarding the Contreras homicide. Simply stated, there is no evidence defendant killed Contreras because defendant believed he was in
 
 imminent danger
 
 of being killed by him. (See CALJIC No. 5.12.) Further, just because the court permitted instructions on perfect self-defense does not mean that substantial evidence supported the giving of an imperfect self-defense instruction. To the contrary, it would not have been error for the trial court to have denied perfect self-defense instructions with regard to Contreras because no substantial evidence supported such a defense.
 
 (People
 
 v.
 
 De Leon
 
 (1992) 10 Cal.App.4th 815, 824, 825 [12 Cal.Rptr.2d 825] [conc. opinion of Johnson, J., expressed belief the trial court erred by instructing on self-defense because no substantial evidence supported that claim].)
 

 This was a classic lying-in-wait, execution-style, premeditated and deliberate murder committed out of revenge. There was no evidence from which a jury could reasonably conclude defendant held an actual or honest belief in the need to defend against imminent danger to himself or others.
 
 (People
 
 v.
 
 De Leon, supra,
 
 10 Cal.App.4th at pp. 824-825.)
 

 
 *1271
 
 D.
 
 The Moore homicide
 

 Defendant also contends the trial court erred by failing to instruct on the
 
 Flannel
 
 defense with regard to the Moore homicide. We find no error.
 

 The record reflects defendant did not request the
 
 Flannel
 
 defense instruction with regard to the Moore homicide, only the Contreras homicide. Although it is not clear, defendant apparently contends the trial court had a sua sponte duty to give CALJIC No. 5.17 with respect to the Moore case. He does not mention that the trial court was never asked to give the instruction with regard to the Moore case. Since no request was made to give CALJIC No. 5.17 with respect to the Moore case, a different standard of review applies.
 

 In
 
 People
 
 v.
 
 Barton
 
 (1995) 12 Cal.4th 186 [47 Cal.Rptr.2d 569, 906 P.2d 531], the court revisited the scope of a trial court’s relatively broad duty to instruct on lesser included offenses, and its somewhat more limited duty to instruct on possible defenses to the crime(s) charged.
 
 (Id.
 
 at p. 194.) The court discussed
 
 People
 
 v.
 
 Sedeno
 
 (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913], and explained:
 

 “[A] trial court must, sua sponte, or on its own initiative, instruct the jury on lesser included offenses ‘when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.’ [Citation.] ‘The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to it being given. [Citations.] Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense.’
 
 (Id.
 
 at p. 716, fn. omitted.)
 

 “In contrast to lesser included offenses, a trial court’s duty to instruct, sua sponte, or on its own initiative, on particular defenses is more limited, arising ‘only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant’s theory of the case.’ [Citations.]
 

 “When, however, the question is whether the trial court must, on its own initiative, instruct the jury on
 
 defenses
 
 not asserted by the defendant, different considerations arise. Failure to so instruct will not deprive the jury of the
 
 *1272
 
 opportunity to consider the full range of criminal offenses established by the evidence. Nor is the prosecution denied the opportunity to seek conviction on all offenses included within the crime charged. Moreover, to require trial courts to ferret out all defenses that might possibly be shown by the evidence, even when inconsistent with the defendant’s theory at trial, would not only place an undue burden on the trial courts but would also create a potential of prejudice to the defendant. As we said in
 
 Sedeno, supra,
 
 10 Cal.3d at pages 716-717: ‘ “Appellate insistence upon
 
 sua sponte
 
 instructions which are inconsistent with defense trial theory or not clearly demanded by the evidence would hamper defense attorneys and put trial judges under pressure to glean legal theories and winnow the evidence for remotely tenable and sophistical instructions.” ’
 

 “As set forth above, sound policy considerations underlie the distinction that
 
 Sedeño, supra,
 
 10 Cal.3d 703, drew between a trial court’s relatively broad duty to instruct on lesser included offenses and its less expansive duty to instruct on defenses.”
 
 (People
 
 v.
 
 Barton, supra,
 
 12 Cal.4th at pp. 194-197, fn. omitted.)
 

 In the instant case, the trial court instructed on all lesser included offenses to murder, including both voluntary and involuntary manslaughter. Defendant’s main theory of defense, based on his pretrial statements, was perfect self-defense with regard to the Moore case. To corroborate his defense that Moore was the aggressor, defendant presented character witnesses regarding his own character for nonviolence and Moore’s character for violence. In addition, uncontradicted evidence established Moore had attacked and slashed defendant’s face with a knife a short time before defendant returned to Moore’s room and eventually stabbed him to death. Further, the evidence also raised the possibility defendant acted in a heat of passion which negated malice aforethought based on Moore’s earlier assault on him with a knife. Thus, the court properly discharged its duties by instructing on these theories of defense, and by instructing on lesser included offenses based on these theories.
 

 The court was not obligated to also instruct on the
 
 Flannel
 
 defense with respect to the Moore case because no request was made, and because it was not “ ‘ “clearly demanded by the evidence.” ’ ”
 
 (People
 
 v.
 
 Barton, supra,
 
 12 Cal.4th at p. 197.)
 

 We reiterate defendant does not point to
 
 any
 
 evidence which would support a theory of an honest but unreasonable belief in the need to kill in self-defense. As noted earlier, defendant’s argument is purely a legal one. His position is that the only difference between perfect and imperfect
 
 *1273
 
 self-defense is whether the belief is reasonable. Thus, defendant concludes where the evidence warrants instructions on perfect self-defense, the evidence necessarily also warrants instructions on imperfect self-defense. We reject this argument, and hold the imperfect self-defense instruction was not clearly demanded by the evidence.
 

 Support for defendant’s argument may be found in the dictum of
 
 People
 
 v.
 
 De Leon, supra,
 
 10 Cal.App.4th at page 824, where the identical argument was made. There the court stated:
 

 “It is hard to fault appellant’s logic. If there was substantial evidence of his ‘honest belief’ for self-defense purposes, there was substantial evidence of his ‘honest belief’ for
 
 imperfect
 
 self-defense purposes.
 

 “But we are satisfied, and so hold, there was not substantial evidence of ‘honest belief’ for either self-defense or imperfect self-defense.”
 

 In a concurring opinion in
 
 De Leon,
 
 Justice Johnson opined that if there had been substantial evidence to support a self-defense instruction, it would have been error to “refuse to give” the imperfect self-defense instruction.
 
 [8]
 
 (10 Cal.App.4th at p. 825.)
 

 In the subsequent case of
 
 People
 
 v.
 
 Ceja
 
 (1994) 26 Cal.App.4th 78 [31 Cal.Rptr.2d 475], the same division held it was reversible error for the trial court to have refused to instruct on the lesser included offenses of voluntary and involuntary manslaughter where the evidence warranted instructions on perfect self-defense. The court found the evidence at trial was sufficient to have permitted the jury to conclude the defendant honestly but unreasonably believed his life was in danger, making the killing at most voluntary or involuntary manslaughter.
 
 (Id.
 
 at pp. 85-86.) In a concurring opinion, Justice Johnson wrote separately to register his opinion that “. . . a trial court must also instruct on ‘imperfect self-defense’ whenever it determines a ‘perfect self-defense’ instruction is appropriate.”
 
 (Id.
 
 at pp. 88-89.)
 

 The
 
 Ceja
 
 case is distinguishable since the defendant requested the
 
 Flannel
 
 instruction whereas here, defendant did not. To the extent
 
 De Leon
 
 and/or
 
 Ceja
 
 suggest that imperfect self-defense instructions must be given whenever perfect self-defense instructions are warranted by the evidence, we disagree.
 

 
 *1274
 
 Defendant’s statements to police comprise the sole eyewitness account of what occurred before Moore’s death. Defendant said during his first altercation with Moore, Moore obtained a knife and stabbed him in the face. He denied making threats to Lashonda after they left the room, that he would return and kill Moore. Defendant called his friend, Raul Moran, who picked him up, and they picked up Lashonda. All three went to Moore’s room to try to retrieve defendant’s wallet. Lashonda was unsuccessful in getting the wallet, so they dropped her off, obtained the room key from her, and returned to Moore’s room. When he returned, defendant entered Moore’s room with Moran. Defendant was confronted by Moore, who went to get a knife, and they struggled. Moore came at defendant and fell on the knife, at which point defendant stabbed Moore more than once. Defendant stated he was afraid of Moore, and he stabbed him in self-defense. Defendant and Moran ran from the room and drove away.
 

 The prosecution evidence was that after Moore originally assaulted defendant with the knife, defendant told Lashonda he could not believe Moore had stabbed him. He told Lashonda more than once not to go back to the room. “Don’t be there because he’s not going, to live any more [sic].” Defendant also told her he was going to go get one of his homeboys. When Lashonda asked defendant not to do anything, defendant said, “well, once they see my face, you know, I ain’t going to be able to do anything about that.”
 

 About 90 minutes after the altercation, Lashonda was picked up by defendant and another male in a vehicle. Defendant asked Lashonda to go to the motel room and help him retrieve his wallet. He assured Lashonda he was not intending to do anything to Moore. She could not recall whether defendant showed her a knife. Upon returning to the motel room and opening the door with her key, Moore immediately jumped to his feet and asked what they were doing. Lashonda responded that defendant only wanted to retrieve his wallet. Moore, who was very upset, told them he did not have defendant’s wallet. Lashonda handed the room key to defendant, saying she did not want to get involved, and left.
 
 [9]
 

 Around 9 o’clock that morning, neighbors heard screams, cries for help and banging on the walls coming from Moore’s room. Peter Song was vacuuming the hallway at this time near the room. He knocked on the window of Moore’s room. Within five seconds, the door suddenly slammed open, and two men left the room and ran off.
 

 
 *1275
 
 Moore, who was bleeding heavily, left his room and collapsed. He later died from stab wounds to his chest and abdomen. He also had defensive-type stab wounds on his hands.
 

 The above evidence does not clearly demand an instruction on imperfect self-defense thereby requiring the trial court to give the instruction sua sponte.
 
 (People
 
 v.
 
 Barton, supra,
 
 12 Cal.4th at p. 201 [the need to instruct sua sponte arises only when there is substantial evidence the defendant killed in unreasonable self-defense, not when the evidence is minimal and insubstantial].) Defendant’s statements, if believed by the jury, could only lead to an acquittal based on justifiable homicide. It is inconceivable a jury could find defendant (who had earlier been attacked by Moore with a knife, and whose life was spared only because others intervened) acted unreasonably in killing Moore after Moore once again attacked him with a knife.
 

 Similarly, if the jury believed the prosecution’s theory (that defendant threatened to kill Moore, obtained a knife and the assistance of a friend, and went to Moore’s room to carry out his stated intentions), it is inconceivable they could find defendant had an actual belief in the need for self-defense.
 

 In
 
 People
 
 v.
 
 Williams
 
 (1992) 4 Cal.4th 354 [14 Cal.Rptr.2d 441, 841 P.2d 961] (decided shortly after
 
 De Leon,
 
 but before
 
 Ceja),
 
 the California Supreme Court rejected a contention similar to that of defendant. In
 
 Williams,
 
 the defendant was charged with rape, and testified the sexual conduct was consensual. The victim testified sex occurred only after the defendant had blocked her attempt to leave, punched her in the eye, pushed her onto the bed, and ordered her to take her clothes off, warning her he did not like to hurt people.
 
 (Id.
 
 at p. 362.) The trial court refused to instruct on the theory defendant had a mistaken, but good faith and reasonable belief in the victim’s consent. (See
 
 People
 
 v.
 
 Mayberry
 
 (1975) 15 Cal.3d 143, 155 [125 Cal.Rptr. 745, 542 P.2d 1337].)
 

 The majority did not accept the defendant’s argument that if the evidence was substantial enough to warrant consent instructions, it also warranted instructions on mistaken belief in consent as well.
 
 (People
 
 v.
 
 Williams, supra, 4
 
 Cal.4th at p. 370.) The majority instead noted the eyewitnesses gave wholly divergent accounts which created no middle ground from which the defendant could argue he reasonably misinterpreted the victim’s conduct. Thus, the court concluded, “There was no substantial evidence of equivocal conduct warranting an instruction as to reasonable and good faith, but mistaken, belief of consent to intercourse.”
 
 (Id.
 
 at p. 362.)
 

 Likewise in this case, there was no substantial evidence warranting an instruction that defendant could in good faith actually believe in the need to
 
 *1276
 
 defend, but be mistaken in this belief, based on Moore’s conduct. Either Moore attacked defendant with a knife—an unequivocal act—or he did not. If he did, defendant acted justifiably in response. If he did not, no substantial evidence supported the notion defendant had an actual, but mistaken belief, in the need to kill Moore in self-defense.
 

 In short, we reject defendant’s contention the trial court was required sua sponte to instruct on imperfect self-defense because it instructed on perfect self-defense. This case illustrates why such a requirement should not be imposed on the trial court. Here, even defendant’s two experienced death penalty attorneys did not believe the Moore case warranted imperfect self-defense instructions. Otherwise, they would have requested the instruction. They were clearly aware of this theory since they attempted to argue it in connection with the Contreras homicide. Even appellate counsel has failed to identify what substantial evidence there is, if any, to support the giving of the
 
 Flannel
 
 instruction with respect to the Moore case.
 

 At a minimum, defendant must be able to explain how his theory of imperfect self-defense could have been argued to the jury, given the evidence. In spite of all this, defendant wants to impose upon the trial court an obligation “ ‘ “to glean legal theories and winnow the evidence for remotely tenable and sophistical instructions.’’ ’ ”
 
 (People
 
 v.
 
 Barton, supra,
 
 12 Cal.4th at p. 197.) We decline to do so.
 

 III., IV.
 
 *
 

 Disposition
 

 Judgment is affirmed.
 

 Ardaiz, Acting P. J., and Vartabedian, J., concurred.
 

 Appellant’s petition for review by the Supreme Court was denied July 9, 1997.
 

 [1]
 

 All statutory references are to the Penal Code unless otherwise noted.
 

 [2]
 

 Gerald Rowe, who lived in the room below Moore’s, testified he heard a commotion that woke him about 7 o’clock that morning. He went to the office to have them call 911. As he returned, he saw Lashonda, who was holding a knife at her side, standing outside Moore’s room talking with another woman and a man who had blood all over his shirt. The three then left.
 

 [3]
 

 The man in dark clothing was also seen by other people at the apartment complex at about 9 o’clock that morning asking for Contreras. Around 2 o’clock that afternoon, the resident directly below vacant apartment No. 202 saw a man in dark clothing drop to the ground from the balcony above. When apartment No. 202 was subsequently checked, the night chain was latched from the inside and the sliding glass door was closed but not locked.
 

 [4]
 

 Defendant apparently claimed he stabbed Moore with Moore’s knife. In this respect, defendant admitted he had his own knife that morning, but claimed he had left it in the car instead of taking it with him to Moore’s room.
 

 [5]
 

 Miranda
 
 v.
 
 Arizona
 
 (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974].
 

 [6]
 

 Fidler was not asked whether Boggs told him, as testified to by Boggs, that defendant was also arrested on the KCSD case.
 

 [7]
 

 The modified proffered instruction was as follows:
 

 “A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully, but does not harbor malice aforethought and is not guilty of murder. This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief. There need not be a reasonable basis for the defendant’s belief in the necessity to defend. That belief may be the product of simple mistaken perception.”
 

 [8]
 

 Interestingly, the majority analyzed the issue as one implicating the trial court’s sua sponte duty to instruct since the defense expressly stated it was not requesting the
 
 Flannel
 
 instruction.
 
 (People
 
 v.
 
 De Leon, supra,
 
 12 Cal.App.4th at pp. 823-824.) Yet, Justice Johnson spoke in terms of whether the “refusal” to give the instruction would have been error where substantial evidence would support perfect self-defense instructions.
 

 [9]
 

 Statements given by Lashonda to police were generally consistent with her testimony. However, she told police she left with defendant and his friend in the vehicle and she was dropped off somewhere. She also told police she had seen a knife in defendant’s possession that morning.
 

 Lashonda later identified defendant from his driver’s license photo taken from defendant’s wallet which was inside Moore’s pocket.
 

 *
 

 See footnote,
 
 ante,
 
 page 1250.