Filed 3/17/14  P. v. Carillo CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>EDGAR G. CARRILLO,<br><br>    Defendant and Appellant. | C073835<br><br>(Super. Ct. Nos.<br>08F10624 & 09F05365) |

A jury convicted defendant Edgar G. Carrillo of the second degree murder of Francisco Torres-Fernandez (count one; Pen. Code, § 187, subd. (a))[1] and assault with a deadly weapon upon Lorena Torres (count two; § 245, subd. (a)).  As to count one, the jury found that defendant intentionally discharged a firearm and caused death in the commission of the offense (§ 12022.53, subd. (d)); as to count two, the jury found that defendant did not personally inflict great bodily injury upon the victim (§ 12022.7, subd. (a)).

---

[1]    Undesignated section references are to the Penal Code.

1

Defendant contends the trial court erred prejudicially as to count one by failing to instruct the jury sua sponte on imperfect self-defense. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

**Prosecution Case**

Lorena Torres (Lorena) testified that the victim in count one was her brother, known as "Paco."[2] In December 2008, Ahida Garcia (Ahida), whom Paco had been seeing for a few months, was renting a room in the house of Lorena and her family.

On Christmas Eve 2008, a cold night with heavy rain and wind, Lorena and Paco went to the house where defendant lived with his wife, Airali Diaz (Airali), their children, and Ildefanso Diaz (Ilde), the brother of Airali and Ahida. Ahida had gone there that evening and Lorena and Paco wanted to exchange presents with her.[3] Lorena drove Paco's sport utility vehicle (SUV) because he had been drinking.

When Lorena and Paco got to the house, she got out and knocked on the door. Ilde answered the door and invited Lorena in. She declined his offer of a beer, saying "I just came for Ahida." Lorena and Ahida went out to the SUV, where Paco was standing.

While Lorena, Paco, and Ahida were talking outside, Ilde came out and told Ahida to go back in; she did not.[4] Ahida said she would come to Lorena's house soon by herself. She walked around the passenger side of the SUV as Lorena and Paco walked around the driver's side.

---

[2] A number of persons in the case share last names and/or were referred to at trial principally by their first names. For clarity and convenience, we call those persons by the names used at trial. We intend no disrespect.

[3] The parties stipulated that if Ahida had been called to testify, she would have stated that Ilde was upset that she was seeing Paco because she was going through a divorce that was not yet final.

[4] According to the parties' stipulation, Ahida would also have testified that Ilde came outside and told her to go back inside.

2

Defendant came out of the house and pushed Paco in the chest. Defendant said: "Why are you coming to my house? Nobody should come to my house." Paco said he did not come there to cause problems. As defendant continued to hit or push Paco, Lorena grabbed defendant by the shoulder and told him they were leaving.

Defendant moved in front of Lorena and Paco, took out a gun, and fired a shot into the ground between Lorena's feet and Paco's feet. They were "paralyzed" because they had not known defendant had a gun.

Lorena then moved quickly toward the driver's side of the SUV, going from the back to the front, and yelling for help. She heard more shots. When she reached the front of the SUV, Ahida, Ilde, and Airali were there.

Going to the back of the SUV again, Lorena saw Paco on the ground; defendant was pointing the gun at his face. As she grabbed Paco and told him to get up, defendant seized her shoulder and hit her on the right side of the head with his gun, then started kicking her in the small of the back; she fell. Her forehead was "full of blood" and later required five stitches at the hospital. When she turned around, she saw defendant and Ilde kicking Paco.

Lorena begged Ahida and Airali to help her. Seeing defendant coming toward her, she got behind one of the women.

Defendant and Ilde ran into the house, came out with keys, got into Ahida's green Nissan Xterra, and drove off. The Xterra was later found abandoned a mile and a half from the crime scene. Defendant was found in Mexico in May 2011.

Sacramento Police Officer John Harshbarger, who was dispatched to the scene to check out a report of gunshots and "a subject down," arrived there shortly after midnight. He saw a man lying on the ground with blood on his chest; the man was unresponsive. Emergency medical technicians determined that the man was dead.

Sacramento Police Detective Jason Kirtlan arrived shortly afterward and saw that the victim had "two apparent gunshot wounds to his upper torso." Kirtlan found an

3

expended bullet on the ground near the victim. A criminalist later determined that it was a .38 or .357 magnum caliber bullet. A detective executing a search warrant on defendant's home a couple of hours later found six live .38-caliber bullets in a dresser drawer in a downstairs bedroom.

Dr. Stephany Fiore, who performed the autopsy on Paco, concluded that he was shot twice in the chest; either wound would have been fatal. The shots were fired from "intermediate range," probably two or more feet away. Paco's face had several bruises and lacerations. According to the toxicology lab, Paco's blood-alcohol content at the time of death was 0.18 percent.

A bullet which remained in the body was sent to the crime lab for analysis. The criminalist determined that, like the bullet found on the ground near the victim's body, it was a .38 or .357 magnum caliber bullet.

**Defense Case**

Defendant testified on his own behalf.

According to defendant, in December 2008 he and his wife occupied an upstairs bedroom in their house. The downstairs bedroom where the police found bullets had been occupied by a cousin for six months. Defendant did not know about the bullets and had never had a gun before Christmas Eve 2008.

As of December 2008, defendant worked at Sherwin-Williams, but also conducted a business on the side selling and installing carpeting. Sometimes friends or employees would come over and borrow his truck. On Christmas Eve, his friend and employee "Luis" came over, asking to borrow the truck and saying he would return it the next day; he had a gun with him and asked defendant to take it and hold it for him. He left five or ten minutes before Lorena and Paco arrived.[5]

---

[5]   Defendant had known Luis for four or five years and used him to help on jobs two or three days a week, but he was homeless and defendant did not know his last name or how

4

While defendant was on the telephone with relatives, another call came in.  The person on the other end said "Who the fuck are you?"  Defendant demanded that the other person "[s]how some respect" and identify himself; in response, the other person said "What do you care?"  Defendant hung up.

Immediately afterward, a truck came into the driveway; Paco was driving.[6]  Ilde and a male friend of his, whom defendant did not know and who never came into the house, were outside at the time.  They had been outside drinking for "an hour or two."

When defendant went outside to see who had arrived, he saw Paco arguing with Ilde in a threatening manner.  Defendant did not recall Lorena coming to the door and asking for Ahida.  (According to defendant, Lorena could not have knocked on the door and Ilde could not have opened it, because defendant did not hear her knock on the door and Ilde was outside.)[7]  Defendant noticed that Ahida had gone outside, but did not know why.  After she went out, defendant heard her and Lorena also yelling.  Ilde's unnamed friend was not yelling.

---

to locate him now.  Luis had never asked defendant to hold a gun for him before, and defendant did not know why he did so on this occasion.  Defendant "didn't think about it."  He did not know if the gun was loaded when Luis gave it to him in the bathroom of defendant's house, but defendant put the gun in his pocket and went back to the living room where his children were.  Defendant did not put the gun away because Luis said he was coming back after buying beers at the liquor store.  Defendant was not concerned about whether the gun could go off by accident.

[6]  Defendant did not know Paco and did not remember ever meeting Lorena.  Defendant had stopped briefly at Lorena's house once to measure for carpets.

According to defendant, when Lorena testified that she was driving the SUV she was "covering for her brother."

[7]  Defendant said Lorena was wrong when she testified that Ilde came out after Ahida and yelled at her to get back inside.  Asked about the stipulation that Ahida would have testified to the same effect, defendant said Ahida was also wrong.

Defendant asked Paco who he was.  Paco, who was "very drunk and violent," said "What do you care?"[8]  Ahida and Lorena were trying to calm him down.

According to defendant, Paco "started coming at me.  He kicked me a few times, so then I pulled out the gun and I shot at the ground, and then he came at me, and things happened very quickly."  Just before defendant fired the shot, Paco said he "was going to, uh, beat the shit out of [him]."  Defendant shot into the ground because he got scared and "to save [his] own life."

As Paco came at defendant, the gun fired twice.  After Paco fell, Ilde took the gun from defendant and started kicking Paco on the ground.  When Lorena came over, Ilde hit her on the forehead with the gun.

Ilde grabbed the keys to Ahida's truck and said, "Let's go, let's go."  They drove to a gas station and parked there, then called a friend and asked him to give them a ride to Mexico.

Defense counsel asked:  "Moments just before you shot [Paco], what were you thinking?"  Defendant answered:  "Well, that he was going to hurt me because he -- he threatened my life."  Asked whether defendant had any weapons, defendant said:  "No. He just -- he made a move like he was putting his hands into his pants."

On cross-examination, defendant said Paco threatened "to kick our ass." (Defendant conceded that he could have walked away from Paco.)  After making this threat, Paco walked away toward the back of his truck, "act[ing] like he was going to grab something," and "mention[ing] he was going to grab a weapon."[9]  Defendant took

---

**8**   Defendant asked Ilde who Paco was.  Ilde just said Paco was "a son-of-a-bitch."

**9**   The prosecutor asked:  "You didn't tell us that until just this second when I asked you, did you?"  Defendant said:  "Well, you did not ask me that."  The prosecutor followed up:  "When your attorney asked you about the threats, did you just forget to tell us at that time that Paco said he was going to get a weapon?"  Defendant said:  "Yes."

6

the gun out of his pocket and fired into the ground only after Paco threatened him and went back toward the truck. When defendant fired the shot and told Paco to leave, Paco was facing him. He came forward; they struggled and the gun went off. Defendant did not know how it fired. He and Paco were touching each other and struggling when it happened.[10]

Defendant did not hit Lorena with the gun or kick her; Ilde did. Lorena's testimony on that point was mistaken. Lorena was also mistaken when she testified that defendant drove the Xterra from the scene; Ilde was the driver.

### Instructions

The trial court noted that the instructions in the record so far were "a matter of our consensus." The court then stated that the facts as to count one warranted instruction on self-defense (apparently not part of the "consensus" instructions); defense counsel agreed.[11] The court stated further that defendant's testimony that the gun "went off . . . in the course of a struggle" would also warrant instruction on accident, though it contradicted defendant's claim that he shot intentionally in self-defense. Defense counsel, "[f]or tactical reasons," requested that the court not instruct on accident. The court agreed not to do so. Neither counsel proposed any other instruction.

---

[10] Asked about Dr. Fiore's opinion that the shots were fired from at least two feet away, defendant said: "When he -- when he came at me, you can get separated a little, and that's when it fired. It wasn't very far." Defendant repeated that the shots were fired while he and Paco were struggling, but finally said: "I don't remember what the distance between Paco and I was, whether it was two feet, three feet. I don't know."

[11] The prosecutor requested that, along with self-defense instructions, the jury should receive instructions on mutual combat and "that a self-defense claim cannot be contrived." The court indicated it would give those instructions and did so.

7

The trial court instructed the jury as to count one on justified self-defense and on "heat of passion" voluntary manslaughter. The court did not instruct on imperfect self-defense.

## DISCUSSION

Defendant contends his testimony that Paco threatened to "beat the shit out of him or kick his ass," then failed to back off after a warning shot, then "seemed to be reaching into his pants for something," required the trial court to instruct sua sponte on imperfect self-defense. Relying on *People v. Randle* (2005) 35 Cal.4th 987, overruled on another point in *People v. Chun* (2009) 45 Cal.4th 1172, 1201, and *People v. Vasquez* (2006) 136 Cal.App.4th 1176, defendant contends further that the court's failure to instruct on imperfect self-defense was prejudicial error under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) because the jury rejected premeditation and "sen[t] out two notes regarding the evidence . . . ." Defendant also contends that the failure to instruct on imperfect self-defense amounted to failing to instruct on the lesser included offense of voluntary manslaughter, an error of constitutional dimension which requires reversal unless we find the error harmless beyond a reasonable doubt. (See *People v. Lewis* (2001) 25 Cal.4th 610, 645 (*Lewis*); *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] (*Chapman*).) We conclude that defendant was not entitled to instruction on imperfect self-defense, but even if he were entitled to such instruction the error in failing to give it was harmless under the *Watson* standard.

"The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request. [Citations.] That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser. [Citations.] To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial–that is, it must be evidence from which a jury composed of reasonable

8

persons could conclude that the facts underlying the particular instruction exist. [Citations.]" (*People v. Blair* (2005) 36 Cal.4th 686, 744-745.)

The duty to instruct on lesser included offenses includes the duty "to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support." (*People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).)

"In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury. [Citations.] Moreover, . . . the sua sponte duty to instruct on lesser included offenses . . . arises even against the defendant's wishes, and regardless of the trial theories or tactics the defendant has actually pursued. Hence substantial evidence to support instructions on a lesser included offense may exist even in the face of inconsistencies presented by the defense itself." (*Breverman, supra*, 19 Cal.4th at pp. 162-163, fn. omitted.)

" 'An *honest but unreasonable* belief that it is necessary to defend oneself from imminent peril to life or great bodily injury negates malice aforethought, the mental element necessary for murder, so that the chargeable offense is reduced to manslaughter.' [Citation.]" (*In re Christian S.* (1994) 7 Cal.4th 768, 773.) "[S]ubstantial evidence of . . . unreasonable self-defense may exist, and the duty to instruct sua sponte may therefore arise, even when the defendant claims that the killing was accidental, or that the [state] of mind on which [unreasonable self-defense] depend[s] w[as] absent." (*Breverman, supra,* 19 Cal.4th at p. 163, fn. 10.) However, "trial courts [need not] instruct sua sponte on unreasonable self-defense in every murder case. Rather, the need to do so arises only when there is substantial evidence that the defendant killed in unreasonable self-defense, not when the evidence is 'minimal and insubstantial.' [Citation.]" (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. omitted (*Barton*).)

9

Case law conflicts as to whether the trial court must always instruct on imperfect self-defense if it instructs on justified self-defense; however, the most recent cases on point hold that even where a justified self-defense instruction is properly given, the evidence might not support instructing on imperfect self-defense. (See *People v. Ceja* (1994) 26 Cal.App.4th 78, 85-86 (maj. opn. of Lillie, P. J.) [failure to instruct on imperfect self-defense as well as justified self-defense reversible error]; id. at pp. 88-91 (conc. opn. of Johnson, J.) [expressing view such instruction must always be given]; but see *People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1273 (*Rodriguez*) [no duty to instruct sua sponte on imperfect self-defense, regardless of the evidence, merely because justified self-defense instruction given; *Ceja* distinguishable because imperfect self-defense instruction requested]; accord, *People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1229-1232 (*Valenzuela*), citing *Barton, supra*, 12 Cal.4th at p. 201.) We agree with *Rodriguez* and *Valenzuela*.

Where "[the defendant]'s testimony, if the jury believed him, could only lead to a conclusion that he acted in justifiable self-defense . . . , not to a conclusion that he acted in imperfect self-defense," the trial court has no duty to instruct sua sponte on imperfect self-defense. (*Valenzuela, supra*, 199 Cal.App.4th at p. 1232.) This is such a case.

Defendant testified that after threatening defendant's life, Paco headed for his vehicle while saying "he was going to grab a weapon."[12] If credited, this evidence, together with the evidence that Paco was drunk, belligerent, and undeterred by a warning shot, would have supported defendant's claim that he reasonably feared for his life. We see no way in which a jury could have found on that evidence, considered as a whole, that defendant's alleged fear for his life was unreasonable. Therefore, he was not entitled to an instruction on imperfect self-defense. (*Barton, supra*, 12 Cal.4th at p. 201;

---

[12] Defendant refers to Paco's threats in general terms, but the only specific threat he cites is the threat to "beat the shit out of [defendant]" or "kick his ass."

*Valenzuela, supra,* 199 Cal.App.4th at p. 1232; *Rodriguez, supra*, 53 Cal.App.4th at p. 1273.)

But even assuming the trial court erred by not instructing sua sponte on imperfect self-defense, the error was harmless.

We reject defendant's claim that the *Chapman* standard applies. In *Lewis, supra*, 25 Cal.4th 610, which defendant cites for the proposition that the failure to instruct on a lesser included offense is constitutional error, the trial court did not instruct on manslaughter, a lesser included offense of murder as to which the defendant argued that substantial evidence would have supported instruction. (*Id.* at p. 645.)[13] Here, the trial court did instruct on the lesser included offense of voluntary manslaughter; the court merely omitted instruction on one theory of that offense (imperfect self-defense). Defendant cites no authority, and we know of none, holding that the failure to instruct on all possible theories supporting a lesser included offense as to which the jury was instructed is constitutional error implicating *Chapman*. In fact, the authorities on which he mainly relies to support his claim of prejudice from the failure to instruct on imperfect self-defense apply the *Watson* standard. (*People v. Randle, supra*, 35 Cal.4th at p. 1003;

---

[13] The *Lewis* court did not decide whether the trial court's failure to so instruct was error because the error, if any, could not have prejudiced the defendant. (*Lewis, supra*, 25 Cal.4th at p. 646.)

In defendant's reply brief, he belatedly cites *People v. Thomas* (2013) 218 Cal.App.4th 630 (*Thomas*), an opinion published before he filed his opening brief, as authority for the proposition that "failure to instruct on a voluntary manslaughter theory in a murder trial constituted federal constitutional error." However, in *Thomas*, as in *Lewis,* the failure to instruct on the "theory" of heat of passion and provocation meant that the jury received no instruction at all on voluntary manslaughter, a lesser included offense as to which there was evidence supporting the instruction. (*Thomas,* at pp. 642-645.) Furthermore, the failure to instruct on heat of passion and provocation in *Thomas* was federal constitutional error because it eliminated the prosecution's burden to prove malice, an element of murder, by proving the absence of provocation. (*Id.* at p. 643.) Here, as we have mentioned, the trial court instructed on heat of passion and provocation.

*People v. Vasquez, supra*, 136 Cal.App.4th at p. 1180.) We shall also apply that standard.

Under *Watson*, there is no reasonable probability that defendant would have obtained a more favorable outcome had the trial court instructed the jury on imperfect self-defense. The case presented a clear credibility contest between Lorena and defendant. Lorena's story was simple, internally consistent, and in harmony with the other evidence aside from defendant's. Defendant, on the other hand, gave multiple versions of the critical events, all of which put him in direct conflict with Lorena (as to whether Ilde came outside and ordered Ahida to go back in the house, thus triggering the fatal sequence of events, defendant also contradicted Ahida). Defendant's strongest evidence for self-defense -- the claim that Paco threatened his life, then went to get a weapon from his vehicle -- emerged only on the third time through defendant's story, after he had previously claimed that Paco merely threatened to beat him up. Defendant's account also rested heavily on peculiar acts allegedly performed by persons whose identities were not verified and who were not produced at trial (Ilde's unnamed friend, with whom Ilde was supposedly talking outside in the rain for hours; defendant's friend and employee "Luis," who mysteriously entrusted defendant at the last minute with the gun used to shoot Paco). Moreover, defendant's assertion that the fatal shots were fired during a hand-to-hand struggle with Paco conflicted with the forensic pathologist's opinion that the shots were fired from at least two feet away, and defendant could not explain this discrepancy.[14] Finally, defendant's flight to Mexico, where he remained in hiding for years, did not strengthen his credibility. In light of all of this evidence, we see

---

[14] Despite defense counsel's tactical decision to refuse instruction on the theory of accident, the jury might also have perceived that defendant's claim the gun went off without any deliberate act on his part was inconsistent with his claim of self-defense.

no possibility that the jury would have found defendant's story more believable than the contrary evidence had the trial court instructed on imperfect self-defense.

## DISPOSITION

The judgment is affirmed.

        BLEASE        , Acting P. J.

I concur:

    NICHOLSON    , J.

I concur because no substantial evidence supports the defense of imperfect self-defense on this record.

    DUARTE      , J.

13