Filed 12/29/20  P. v. Reuschel CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C084423 |
| Plaintiff and Respondent, | (Super. Ct. No. 15F2507) |
| v. | |
| RALF EDWARD REUSCHEL, | |
| Defendant and Appellant. | |

In May 2015 a camper's dog discovered the decomposing body of Timothy Mitchell in a pit.  Defendant Ralf Edward Reuschel, Mitchell's uncle, was charged with murder.  A jury found defendant guilty and the court sentenced defendant to 25 years to life for murder, plus an additional 25 years to life for the special allegation that defendant used a firearm in the commission of the murder.  Defendant appeals, arguing instructional error, ineffective assistance of counsel, and sentencing error.  In a supplemental brief, defendant requests remand to permit the trial court to exercise its discretion to strike the firearm enhancement.  We shall remand for the trial court to exercise its discretion as to the firearm enhancement, but in all other respects we shall affirm the judgment.

1

An information charged defendant with murder with the special allegation that defendant intentionally and personally used a firearm in commission of the murder. (Pen. Code, §§ 187, subd. (a), 12022.53, subd. (d).)[1] The following evidence was introduced at the jury trial.

**The Murder**

On May 3, 2015, a camper's dog discovered the body of Mitchell in French Gulch, near Cline Gulch Road. The body lay in an abandoned pit, covered by a garbage bag. Officers found the body blistered and discolored due to drying and the beginnings of decomposition. The blistering indicated Mitchell had been dead for more than a few hours. The body bore no identification, but fingerprint analysis matched the prints taken to those of Mitchell.

Officers also discovered faint tire impressions near the body, indicating a vehicle had turned around. The crime scene yielded no weapons and no signs of a struggle. It appeared Mitchell had been killed elsewhere and his body dumped in the pit.

An autopsy revealed heavy maggot activity, with small maggots, large maggots, and flies. Mitchell's head had a bullet hole in the upper left side.

Officers spoke to Charles Adney, Mitchell's uncle and defendant's brother. Adney told Detective Kyle Wallace that he sent Mitchell to stay with defendant at an RV park.

Detectives went to defendant's trailer. Detective Wallace spoke to defendant's wife, Kimberlee Reuschel, and Sergeant Brian Jackson spoke with defendant.

---

[1] All further statutory references are to the Penal Code unless otherwise designated.

**Interviews with Defendant**

Defendant agreed to speak with Sergeant Jackson about Mitchell. According to defendant, in late April 2015, Mitchell arrived at defendant's trailer. One evening, after drinking, Mitchell became upset and violent. Mitchell believed he was a "Dark Lord Sith," a Star Wars character. He said he could "destroy everybody on the planet." Mitchell told defendant that when he drinks a lot of beer he becomes "the Sith." Mitchell exhibited this behavior even when not drinking.

Later in the evening, as defendant tried to sleep, Mitchell asked for marijuana. After defendant told him he could not get any, Mitchell grabbed defendant, shoved him down, grabbed him by the neck, and said he would kill him and everybody else. Kimberlee was asleep at the time. Mitchell told defendant he was going to his parents' house.

Defendant advised Mitchell against going out that late at night because defendant had been beaten up in the area in 2014. He had been hit with a baseball bat that split his head open. He did not know who had attacked him.

Mitchell left on foot. Defendant did not follow because he was scared by his experience in 2014. Defendant did not know why Mitchell would be in French Gulch. Defendant went to French Gulch about once a month and had been there two weeks before to pick up his mail at the post office. He had not been on the road where Mitchell was found for over a year.

During a break in his interview with defendant, Sergeant Jackson conferred with Detective Wallace about the latter's conversation with Kimberlee. Wallace's information conflicted with defendant's version of events.

Sergeant Jackson questioned defendant about the inconsistencies. Defendant admitted he had also been drinking that night. He and Mitchell walked to a gas station and bought more beer. On the way home, Mitchell pulled out a gun, frightening

defendant who did not know Mitchell had a gun. Mitchell fired shots at nearby lights until police arrived.

The duo headed back to defendant's trailer and Mitchell began talking about the Sith again. Mitchell grabbed defendant by the neck and said, "I'll blow your fuckin' brains out." Defendant bled where Mitchell grabbed him and went into the bathroom to stop the bleeding. When defendant came out of the bathroom, he told Mitchell he was going to bed. Mitchell overpowered defendant and shoved him to the ground. While he was in the bathroom, Mitchell shot at him. Defendant was terrified and asked Mitchell if he was out of his mind. Mitchell left.

After the on-site interview concluded, defendant and Sergeant Jackson spoke again at the police station. Defendant said after Mitchell left, defendant took his pills.

Defendant believed Mitchell's gun was a .380 caliber based on the gun's size. Defendant did not know who owned the gun or where it was now. Defendant's guns were in storage.

Sergeant Jackson asked defendant, "Why Cline Gulch?" Defendant said, "it was self-defense." He told Jackson his previous comments were true, but he could not remember how he got the gun away from Mitchell. Defendant and Mitchell struggled with the gun after he came out of the bathroom. Mitchell was shot as they struggled over the gun, and as he tried to run defendant shot him again. Defendant told Jackson, "I thought he was gonna come at me again . . . I didn't know what was gonna happen." Defendant took his pills and went to bed.

When defendant woke up the next morning, he wondered what had happened. Mitchell's body lay face up on the floor. Defendant could not move the body, so it stayed there for two days. Kimberlee asked defendant to get it out of the trailer because it was "creepin' [her] out." For several days, defendant tried to find a place to leave Mitchell's body. After Kimberlee suggested French Gulch, defendant took the body there and left it in a ditch.

4

After the police first arrived at the trailer, defendant lied because he thought, "Well, why did I do that then?" He put the gun in storage and threw away the four casings from shots fired inside the trailer. Defendant said he had been sitting down when he shot Mitchell as Mitchell headed to the door. The shots woke up Kimberlee, who "basically went into shock."

Sergeant Jackson told defendant that Kimberlee said she woke up to the gunshots and saw defendant standing over Mitchell. Defendant pointed a gun at Mitchell and fired at him as Mitchell lay on the ground. When Jackson asked defendant if Kimberlee was telling the truth, defendant responded, "she's tellin' . . . the truth." Defendant stated he had fired more shots at Mitchell on the floor. Mitchell began moving and appeared to be trying to get up.

Defendant said his son's .357-caliber handgun was in the trailer. According to defendant, Mitchell had grabbed him by the neck and put the gun to defendant's head. After they separated, defendant went into the bathroom. Mitchell fired shots at defendant and the two wrestled over the gun. Defendant fell down and grabbed the gun. He fired at Mitchell, then stood up and fired at Mitchell again while he lay on the ground.

The following day, Detective Wallace and Sergeant Jackson met with defendant while he was in custody. Defendant accompanied the police to show them where he stored the gun he shot Mitchell with. The trip was recorded. Defendant said, on the night of the shooting, Mitchell grabbed his head, put a .357-Magnum revolver to his head, and said, "I'll blow your fucking brains all over this trailer." Defendant feared that Mitchell might accidentally shoot Kimberlee sleeping nearby.

In addition, defendant said he was under the influence of alcohol and pills the night of the shooting. Defendant's drinking contributed to the events. Detective Wallace asked defendant if alcohol played a role in his shooting at Mitchell when he walked towards the door and when he lay on the ground. Defendant responded: "I'm pretty sure it was the alcohol, 'cause that's not the way I am." He stated, on the night of the

shooting, Mitchell was "insisting that he was this . . . the dark side guy." Mitchell threatened him, saying, "I can kill you," pulled out defendant's .357 handgun, and shot at defendant through the bathroom. Defendant "came down and jumped him" and he believed he fired another round.

Defendant told Mitchell to leave and as Mitchell walked out the door, defendant fired two more shots. Mitchell fell to the ground, but defendant did not know if he had hit him. Defendant saw Mitchell move and believed he fired another shot. Defendant recalled firing "three fast ones." Before the final shot, defendant believed Mitchell was moving. Defendant feared Mitchell was "playing possum" and waiting for defendant to let his guard down. Mitchell tried to get up and defendant knew he had shot him. Defendant stated Kimberlee ran to the bathroom, but later stated he couldn't remember Kimberlee being in the bathroom or telling her to hang up when she called 911.

Defendant later stated Mitchell grabbed him by the throat and threw him to the ground. The pair struggled and Mitchell grabbed him by the back of the neck and held a gun to his head. Mitchell had an "evil look" and told defendant, "I'll blow your fuckin' brains all over . . . this trailer." Frightened by Mitchell's evil look, defendant told him to leave. Mitchell began to walk away, but defendant did not know where the gun was.

Mitchell got up, but defendant could not see if he had the gun. Defendant thought this was when he grabbed his Glock. He did not know where the .357 was, but he thought Mitchell had it. When Mitchell walked to the door, defendant fired three shots. Mitchell fell and defendant could only see his back. Mitchell moved and tried to get up and defendant fired a third shot and Mitchell dropped. Before the shooting Mitchell had been moaning, but after the shooting there was silence.

**Kimberlee's Testimony**

At trial, the jury heard Kimberlee's testimony from the preliminary hearing, due to Kimberlee's death in September 2015. Kimberlee and defendant owned more than 40

firearms, most of them in storage.  They kept some in their trailer, including a Glock nine-millimeter handgun, a rifle, and a .357 handgun.  Defendant kept the Glock near his bed, the rifle on the sofa bed, and the handgun might have been under the dinette bed. Defendant was in charge of the guns.

Mitchell was 32 at the time of his death, and had previously visited them as a teenager.  The couple kicked him out after he used a BB gun to shoot at children coming home from school.  They told him never to come back.  However, in April 2015 they arranged for Mitchell to stay with them in their trailer.

Mitchell had been with the couple for three days before the murder.  Defendant showed Mitchell his nine-millimeter handgun, the rifle, and the other handgun. Kimberlee never saw Mitchell with a weapon.

Defendant's drinking impacted his behavior.  Light drinking made him silly, but he became belligerent, mean, and evil when he drank too much.  Defendant would call Kimberlee stupid and say that she was "no good for nothing."  Kimberlee described his personality change when drinking as "Jekyll and Hyde."

The evening of the shooting, Mitchell and defendant were outside the trailer drinking a lot of beer.  Kimberlee was in bed when they came back inside the trailer.  She went to sleep around 2:00 a.m., woke up when she heard the trailer door open, and woke up again when she heard Mitchell tell defendant to get off his stomach because defendant was sitting on him.  In bed, Kimberlee could only see defendant's head.  She went back to sleep.

A gunshot woke Kimberlee up and she saw Mitchell lying on the ground with defendant standing over him with a gun in his hand.  Defendant said Mitchell moved and he shot Mitchell in the head.  Defendant held a gun.  Mitchell was unarmed and Kimberlee did not see him move.

Kimberlee yelled at defendant to stop and asked him why.  She described defendant's face as blank and he looked like a stranger.  Defendant shot again and

7

Kimberlee again asked why. No more than five minutes passed between the two shots. Kimberlee never heard Mitchell threaten defendant.

Kimberlee ran into the bathroom and began smoking. She called 911, but defendant told her to hang up. Defendant threatened to kill her. Afraid of defendant, Kimberlee hung up the phone. Years earlier, defendant had thrown something at Kimberlee, splitting her lip open. This was the only time he physically abused her.

**Testimony of Defendant's Son Christopher**

Mitchell was killed on April 29, 2015. In the first week of May, defendant's son Christopher went to a barbeque at defendant's trailer. Christopher noticed items in the trailer that did not belong to his parents. Defendant said they belonged to Mitchell, but that Mitchell got mad and had gone to stay elsewhere. Mitchell was going to send for his belongings.

Christopher also saw two pieces of duct tape on the back of the trailer. Defendant told him not to worry about it. Defendant said Mitchell got drunk one night and shot the holes in the bathroom wall with his own gun. He asked Christopher not to talk about it because the neighbors were asking questions. When Christopher asked if defendant had called the police, defendant said Mitchell had left with his adoptive parents.

Defendant had bandages and scratches on his arms and legs. Christopher asked about them and defendant said Mitchell was drunk one night and became violent. Mitchell picked defendant up by his throat, threw him on the ground, and roughed him up. Christopher asked again why defendant did not call the police, and defendant told him not to worry about it. Defendant said he asked Mitchell to leave and Mitchell became angry and left. Again Christopher suggested defendant call the police and defendant again replied, "don't worry about it." As the barbeque wound down, defendant began to get drunk. Christopher left because defendant "usually turns into something bad" when he drinks, a "[b]lackout kind of violent."

8

Christopher recounted defendant had been drinking for many years; drinking changed defendant's behavior. The more defendant drank, traumatic memories of the past would begin to emerge. Defendant would go from tipsy to physical and violent. Christopher stated defendant would wave guns around and tried to shoot guns in the house. Defendant once shot a bottle inside the house. He would also throw and break things. When Christopher tried to stop him from driving, defendant would get physical and Christopher would back down.

Defendant once tried to cut the family cat's head off while drunk. Kimberlee tried to pull the pruning shears away from him and defendant accidentally hit her in the head with them. In 2014 defendant threatened to go into the trailer for his gun to shoot Christopher's girlfriend. Defendant then punched Christopher. When Christopher tried to help him up, defendant punched him again.

**Autopsy and Subsequent Investigation**

At the time of the autopsy, Mitchell's body had moderate decomposition and extensive insect activity. Mitchell had a gunshot wound on the left side of his head. The bullet recovered was from the nine-millimeter family of ammunition. He also suffered two other gunshot wounds: one to the left upper chest and one to his right upper arm.

The decomposition of the body prevented an accurate of assessment of any lesser injuries. The examination revealed no visible fractures on Mitchell's fingers or hands to indicate hitting or punching. Nor did Mitchell have deep tissue bruises that might result from blunt force impact. A blood sample revealed an ethanol level of 0.169 percent.

Mitchell died from gunshot wounds to the chest and head. It was very likely he was shot in the chest before being shot in the head. The forensic pathologist believed Mitchell was alive at the time he suffered each gunshot wound.

On May 9, 2015, defendant accompanied Detective Wallace and Sergeant Jackson to a storage unit for him to show them the nine-millimeter gun. After defendant showed

9

them the gun's location, they retrieved the gun. Defendant admitted it was the gun used to shoot Mitchell.

An inspection of defendant's trailer revealed two pieces of white duct tape on the back. There were pieces of duct tape in the trailer's bathroom and the shower wall was bowed out a little and cracked. Officers found a bullet, later determined to be a nine millimeter, on the floor inside the wall. Removal of the duct tape revealed holes in the back of the trailer. The angle of beveling of one of the holes was in an upward direction.

**Defense Case**

### *Charles Adney's Testimony*

Mitchell stayed with defendant's brother Adney from February through the end of April prior to the shooting. According to Adney, Mitchell made comments about being the "Sith" or the "Dark Lord" from Star Wars. He made the comments when both drunk and sober.

In March 2015 Mitchell and Adney were at restaurant when Mitchell dropped food in his lap. Mitchell became upset and began screaming and cursing. He told other customers to mind their own business. When another customer stood up to say something, Mitchell told him to sit down or "I'm gonna put you back down." Adney told Mitchell to stop and that they should leave. As restaurant employees gathered, Mitchell continued screaming and cursing. Mitchell had been drinking at the restaurant.

Mitchell lived with Adney and then moved in with defendant and Kimberlee to help them out with their computer. Adney did not tell them about Mitchell's strange behavior.

When Adney visited defendant, he noticed Kimberlee made most of the decisions. Although defendant was very smart, he had trouble making decisions. Defendant was not impulsive. Defendant quit drinking for a long time, but Kimberlee refused to quit. After

10

Mitchell disappeared, Adney asked what had happened. Kimberlee answered all the questions and said they had nothing to do with Mitchell's death.

### *Pathologist Testimony*

Dr. Terri Haddix, a pathologist, reviewed Mitchell's autopsy. Dr. Haddix testified Mitchell would have died from his chest wound in a couple of minutes. Mitchell would have collapsed immediately from the head wound and would have died very quickly. The extent of decomposition made it difficult to determine if Mitchell suffered any bruising or had gunshot residue on his body. Injuries may be more difficult to see with the passage of time and bruises may become "lost" or indistinguishable due to decomposition discoloration.

Dr. Haddix reviewed photographs of defendant's injuries. The photographs revealed "blood blisters" on the fleshy parts at the base of defendant's right thumb. Such injuries do not require a great amount of force and can be caused by pinching. Bruising also appeared on defendant's left forearm near his hand, right shoulder, and chest.

All defendant's injuries could have occurred on the same day as the result of an altercation. The injuries on his left forearm and right hand could have been sustained as "defensive wounds," as a result of warding off an attack. However, other injuries, such as those on defendant's back and chest, were not defensive in nature. Dr. Haddix testified, "It's kind of hard for me to envision how . . . one would be protecting an area of their body by putting their chest or their back in the way or something along the lines like that."

## Other Evidence

An investigator for the public defender's office examined the trailer after it left police custody and had been repurchased. Inside the trailer he took measurements to establish the trajectory pattern for two of the bullets. The investigator testified he was "pretty certain" two of the bullets traveled upwards.

11

In August 2014 defendant was taken by ambulance to the hospital for a head injury. Defendant suffered an abrasion to his head and facial swelling. The doctor believed the injuries could have been caused by an altercation. Defendant, who had a 0.26 percent blood-alcohol level, was uncertain what had happened. The doctor noticed no signs of strangulation.

The manager of the trailer park testified defendant was always friendly and he never saw him consume alcohol. He heard reports of defendant's intoxication from others and confronted defendant. Defendant said he had too many beers and the manager could see he was kind of beat up.

The parties stipulated that on April 29, 2015, in the early morning, police received multiple 911 calls reporting gunshots in the area of Lake Boulevard in Redding. An investigation the following day revealed a hole in the side of a building consistent with a bullet hole. The bullet appeared to have been fired from across the street.

**Verdict and Sentencing**

The jury found defendant guilty of first degree murder and found true the special allegation. The court sentenced defendant to 25 years to life for murder, plus an additional and consecutive term of 25 years to life for the special allegation. Defendant filed a timely notice of appeal.[2]

## DISCUSSION

### I

### *Instructional Error*

Defendant argues the trial court erred in failing to instruct the jury that it could consider evidence of defendant's intoxication in deciding whether he unreasonably believed he had to defend himself.

---

[2] We grant defendant's request for judicial notice filed October 18, 2017.

12

**Background**

Defense counsel requested a modified version of CALCRIM No. 571 on imperfect self-defense that the prosecution had the burden of proving beyond a reasonable doubt that defendant did not believe he was acting in self-defense or defense of another and that he did not actually believe the immediate use of deadly force was necessary. The court denied the requested modifications. Under CALCRIM No. 571 as given, the court instructed "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense or imperfect defense of another." The defendant acted in imperfect self-defense or imperfect defense of another if: "1. The defendant actually believed that he or Kimberlee Reuschel was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against danger; [¶] BUT [¶] 3. At least one of those beliefs was unreasonable."

Defense counsel requested CALCRIM No. 625 on voluntary intoxication. The court instructed the jury with a modification of CALCRIM No. 625 without an objection from defendant. The court instructed: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill, the defendant acted with deliberation and premeditation, or the defendant intentionally discharged a firearm."

The court further instructed: "You may not consider evidence of voluntary intoxication for any other purpose."

**Discussion**

According to defendant, there was ample evidence defendant was very intoxicated and he unreasonably believed he had to defend himself. However, the instruction given

13

limited the evidence of defendant's intoxication and precluded the jury from considering defendant's intoxication in deciding whether he acted in self-defense. "Given the strong evidence of [defendant's] intoxication and the evidence Mitchell acted violently before he was shot, the jury likely would have concluded that due to his intoxication [defendant] acted in the unreasonable belief he had to defend himself against imminent peril."

The trial court must instruct, even in the absence of a request, on the general principles of law relevant to the issues raised by the evidence. These general principles refer to those principles closely and openly connected with the facts before the court and necessary to the jury's understanding of the case. (*People v. Sedeno* (1974) 10 Cal.3d 703, 715, overruled on another ground in *People v. Breverman* (1998) 19 Cal.4th 142, 165.) Before giving an instruction, the court must find legally sufficient evidence in the record to support the finding or inference that the instruction permits. (*People v. Hannon* (1977) 19 Cal.3d 588, 597.)

We review the court's ruling on instructions de novo, independently reviewing the record when the trial court refuses an instruction requested by the defendant based on a lack of substantial evidence. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581-584.) We uphold the trial court's ruling unless the record contains substantial evidence to support the requested instruction. (*People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1269-1270.)

Under section 29.4, "[e]vidence of voluntary intoxication shall not be admitted to negate the *capacity* to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought . . ." (§ 29.4, subd. (a), italics added) but "is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, *or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought*" (*id.*, subd. (b), italics added). Our Supreme Court has held that, "Because harbored *implied* malice does not appear in this enumerated list, section 29.4 prohibits the use of evidence of voluntary intoxication to establish that a defendant

14

acted without implied malice." (*People v. Soto* (2018) 4 Cal.5th 968, 975; see *People v. Turk* (2008) 164 Cal.App.4th 1361, 1375 [evidence of "voluntary intoxication [is] inadmissible to negate implied malice in cases in which a defendant is charged with murder"].) The trial court did not err in instructing otherwise.

In any event, any error was harmless. The evidence of defendant's actions supporting a finding of self-defense was scant and provided largely by defendant. Over a series of interviews, defendant's version of events radically shifted and pivoted. Initially, defendant stated Mitchell, who had been drinking heavily, became violent. He shoved defendant, told him he wanted to kill him, and then left over defendant's protestations. Defendant did not follow Mitchell and did not know why Mitchell was in French Gulch.

After detectives informed defendant of Kimberlee's conflicting version of events, defendant said both he and Mitchell had been drinking. As they walked to the trailer after buying beer, Mitchell pulled out a gun and shot out some streetlights. In the trailer, Mitchell began talking about the Sith, grabbed defendant's neck, and threatened to shoot him. Bleeding, defendant went into the bathroom to stop the bleeding. When he came out, Mitchell shoved him. Defendant subsequently told detectives Mitchell shot at him while he was in the bathroom.

After relocating to the police station, defendant began asking about self-defense and then stated, "it was self-defense." Defendant remembered struggling with Mitchell over the gun and then Mitchell shot him. Mitchell got shot during the struggle. As Mitchell attempted to run out of the trailer, defendant shot him again. Defendant stated, "somethin' in me snapped." Defendant went to bed and found Mitchell's body the next morning. Subsequently, defendant admitted firing another round into Mitchell while he lay by the door. Mitchell was moving and trying to get up.

In an interview the following day, defendant raised the issue of the influence of alcohol and "pills." He stated his drinking influenced his actions. According to

15

defendant, alcohol was the reason he shot Mitchell; "I'm pretty sure it was the alcohol, 'cause that's not the way I am."

The jury had before it a shifting narrative. First, Mitchell overpowered defendant, grabbing his neck; this evolved into Mitchell holding a gun to defendant's head and later into Mitchell shooting at defendant. Initially Mitchell left the trailer unharmed; this evolved into defendant shooting him in the trailer, first just during a struggle over a gun, then firing again into a prone Mitchell.

Given defendant's ever-changing version of events, it strains credulity to conclude there is a reasonable probability the jury would have found defendant believed he was defending himself out of necessity if the court had given the instruction on intoxication in connection with imperfect self-defense. In addition, testimony of Kimberlee and Christopher portrayed defendant as prone to violence when drinking. The testimony regarding Mitchell's drinking and threatening behavior stemmed from an incident in 2002.

The court instructed the jury that defendant acted in imperfect self-defense if he actually believed he was in imminent danger and believed immediate use of deadly force was necessary to defend against the danger, but at least one of these beliefs was unreasonable. The jury rejected this defense, finding defendant guilty of first degree murder. If the jury believed Mitchell presented an imminent danger to defendant, it would have rejected a first degree murder conviction.

## II

### *Ineffective Assistance of Counsel*

Defendant contends defense counsel performed ineffectively by failing to request an instruction on the relationship between provocation and premeditation. The defense presented at trial was that defendant was guilty of voluntary manslaughter because he acted in the heat of passion or in an unreasonable belief in the need for self-defense.

16

Therefore, according to defendant, counsel's failure to request the instruction constituted ineffective assistance.

The instruction in question, CALCRIM No. 522, states: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."

To establish ineffective assistance of counsel, a defendant must show counsel's performance was deficient and fell below an objective standard of reasonableness, and it is reasonably probable that a more favorable result would have been reached absent the deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674, 693].) A reasonable probability is a "probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.)

To perform competently, counsel should realistically examine the evidence at issue and pursue those avenues of defense that, to their best and reasonable professional judgment, seem appropriate under the circumstances. Defense counsel must investigate all defenses, explore the factual bases for defenses, and evaluate the applicable law. (*People v. Freeman* (1994) 8 Cal.4th 450, 509; *People v. Maguire* (1998) 67 Cal.App.4th 1022, 1028.)

We accord trial counsel's tactical decisions substantial deference and do not second-guess counsel's reasonable tactical decisions. (*People v. Maldonado* (2009) 172 Cal.App.4th 89, 97.) We reverse only if the record affirmatively discloses trial counsel could have had no rational tactical purpose for the challenged act or omission. (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437.)

The trial court instructed the jury with CALCRIM No. 520, which states: "If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as

17

defined in CALCRIM No. 521." The jury also instructed with CALCRIM No. 521, which told the jury that to find defendant guilty of first degree murder, the People were required to prove he acted willfully, deliberately, and with premeditation. In addition, the instruction stated: "A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated."

According to defendant, "This is a case where there is no possible satisfactory explanation for counsel's failure to request a pinpoint instruction so the jury could consider the evidence that [defendant] was provoked in deciding whether that provocation impacted the mental state of premeditation and deliberation." Moreover, defendant posits it reasonably probable that had the jury been so instructed, it would have convicted him of second degree murder. Defendant stresses Mitchell's violent nature, especially when drunk.

Here, defense counsel sought to convince the jury defendant was not guilty of first degree murder, but of voluntary manslaughter based on self-defense, unreasonable self-defense, or in the heat of passion. Defense counsel may well have decided that requesting CALCRIM No. 522 would detract from that defense. Second degree murder is punishable by 15 years to life. (§ 190, subd. (a).) Voluntary manslaughter would result in a sentence of three, six, or 11 years. (§ 193, subd. (a).) Faced with this sentencing differential, defense counsel could tactically choose to forego CALCRIM No. 522. We find defense counsel did not perform ineffectively.

### III

### *Motion for a New Trial*

Finally, defendant claims the trial court abused its discretion in denying his motion for a new trial. Defense counsel requested that the court reduce the first degree murder conviction to second degree homicide. According to defendant, the court abused its

18

discretion by relying on improper factors—defendant's actions following the murder—in denying the motion.

**Background**

At sentencing, defense counsel requested that the court find insufficient evidence to support first degree murder and instead find defendant guilty of second degree homicide under section 1181, subdivision (6). In opposing the motion, the prosecution pointed out that " a cold, calculated decision to kill under premeditation and deliberation can be made very quickly. It doesn't have to be a plan."

The court denied the motion: "I think there's ample evidence upon which the jury could have concluded that this was a . . . willful, deliberate and premeditated murder . . . ." The court noted defendant's active efforts to conceal the killing, which indicated a consciousness of guilt. As for defendant, "If he was truly a victim . . . there wouldn't have been any hesitance to call the police. That's what any normal citizen would have done under the circumstance." Defendant's act of concealment and avoidance were "a clear indication of a consciousness of guilt."

In addition, the court focused on defendant's "multiple and conflicting stories, the obfuscation, this meandering, kind of, statement he makes where you are left with a strong sense of how can I make this all fit in a way that helps me, those are all indications of a consciousness of guilt." The court found this another piece of substantial evidence supporting a finding of "cold, calculated, premeditated and deliberate first-degree murder."

The court also considered Mitchell's physical capacity during the incident: "I would have been stunned if the autopsy surgeon hadn't said, he would have been down . . . [h]e might have been awake, but the idea of him attempting to stand up and pose any greater threat to your client . . . my strong impression is that there's no chance that could have occurred, meaning that when your client fired . . . a coup de grâce shot into Mr.

Mitchell's head, it was just further proof of the idea of this cold, calculated intent to kill and premeditation and deliberation."

The court concluded that, given the totality of the evidence, there was more than ample evidence before the jury to conclude beyond a reasonable doubt that defendant committed willful, deliberate and premeditated first-degree murder. The court denied the motion.

**Discussion**

Defendant contends the trial court erred in relying on his actions after the murder to support its conclusion there was ample evidence of a premeditated murder. Therefore, the court should have granted defendant's motion for a new trial under section 1181, subdivision (6) and reduced his conviction to second degree murder.

Under section 1181, subdivision (6), the court may grant a new trial when "the verdict or finding is contrary to law or evidence, but if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict, finding or judgment accordingly without granting or ordering a new trial."

The trial court possesses broad discretion in ruling on a new trial motion. We disturb that ruling only for a clear abuse of that discretion. (*People v. Ault* (2004) 33 Cal.4th 1250, 1260.) "Such an abuse of discretion arises if the trial court based its decision on impermissible factors." (*People v. Knoller* (2007) 41 Cal.4th 139, 156.)

The Supreme Court in *People v. Anderson* (1968) 70 Cal.2d 15 held a defendant's efforts to cover up a crime did not support the finding that the murder was premeditated. According to the court: "Although this type of evidence may possibly bear on defendant's state of mind *after* the killing, it is irrelevant to ascertaining defendant's state of mind immediately prior to, or during, the killing. Evasive conduct shows fear: it cannot support the double inference that defendant planned to hide his crime at the time

20

he committed it and that therefore defendant committed the crime with premeditation and deliberation." (*Id.* at p. 32.)

The *Anderson* court identified three types of evidence that assist in reviewing the sufficiency of the evidence in support of finding premeditation and deliberation: evidence of planning activity, preexisting motive, and manner of killing. However, *Anderson* did not purport to establish an exhaustive list that would exclude all other types of evidence or combinations of evidence that could support a finding of premeditation and deliberation. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.)

Here, the trial court did reference defendant's actions after the murder: his attempts to conceal the crime, failure to contact the police, and his multiple and conflicting stories about what happened. Defendant focuses on the court's comments regarding postmurder conduct. However, the court also emphasized defendant's second "coup de grâce" shot into Mitchell's head as "further proof of the idea of this cold, calculated intent to kill and premeditation and deliberation."

As the Supreme Court concluded: "While our comment in *Anderson* . . . warns against using evidence of a defendant's postcrime actions and statements as the sole support for upholding a finding of premeditated and deliberate murder, such postcrime actions and statements can support a finding that defendant committed a murder for which his specific mental state is established by his actions before and during the crime." (*People v. Thompson* (2010) 49 Cal.4th 79, 113.) Given the court's reliance on defendant's actions during the murder, as well as in the wake of the murder, we cannot find the court abused its discretion in declining to reduce defendant's conviction to second degree murder.

# IV

## *Section 12022.53*

In a supplemental brief, defendant requests that, in light of amended section 12022.53, we remand to the trial court to permit it to exercise its discretion to strike the firearm enhancement. Effective January 1, 2018, section 12022.53, subdivision (h) was amended to provide: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (Stats. 2017, ch. 682. § 2.) Defendant contends the amendment should apply retroactively to all cases not final in which a firearm enhancement was imposed.

The jury found defendant intentionally and personally discharged a firearm in killing Mitchell in violation of section 12022.53, subdivision (d). The People agree the amendment applies retroactively and remand is required if we find the record does not clearly show the trial court would not have exercised its discretion to reduce defendant's sentence.

Both parties cite the language of the statute and *In re Estrada* (1965) 63 Cal.2d 740, as supportive of retroactive application. Under *In re Estrada*, although in general amendments to the Penal Code do not apply retroactively, courts recognize an exception for amendments that reduce the punishment for a specific crime. (*People v. Brown* (2012) 54 Cal.4th 314, 323-324; *People v. Francis* (1969) 71 Cal.2d 66, 75-76.) In addition, the amendment to section 12022.53, subdivision (h) states: "The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law."

We agree with the parties' determination that section 12022.53, subdivision (h) applies retroactively. Here the trial court, during sentencing, found evidence that

22

defendant had a calculated intent to kill with premeditation and deliberation. The court sentenced defendant to 25 years to life for first degree murder, with an additional 25 years to life for the personal and intentional discharge of a firearm. The court noted that "probation was never an option because of the enhancement for the personal and intentional discharge of a firearm causing death, so I did not bother to articulate for the record the factors for and against granting probation, et cetera, because it was just not in play." The court did not indicate it would not have exercised its discretion to reduce defendant's sentence; therefore, we remand to the trial court.

## DISPOSITION

The case is remanded for the trial court to exercise its discretion regarding defendant's firearm enhancement. In all other respects, the judgment is affirmed.


_____/s/_____

RAYE, P. J.



We concur:



_____/s/_____

ROBIE, J.



_____/s/_____

DUARTE, J.

23