Filed 5/10/21  P. v. Duarte CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FERNANDO DUARTE,<br><br>    Defendant and Appellant. | B300955<br><br>Los Angeles County<br>Super. Ct. No. NA102044 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Judith Levey Meyer, Judge. Affirmed.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Attorney General, Scott A. Taryle and Colleen M. Tiedemann, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted defendant and appellant Fernando Duarte of first degree murder. The trial court sentenced him to 50 years to life in state prison. On appeal, Duarte raises seven arguments: (1) the trial court prejudicially erred by not instructing the jury on imperfect self-defense voluntary manslaughter as a lesser included offense; (2) reversal is required because the jury instructions on self-defense and sudden quarrel/heat of passion voluntary manslaughter were incomplete; (3) the court erred by not instructing the jury it could consider the evidence of his mental defect in relation to whether he harbored the mental states of premeditation and deliberation; (4) the court erred in failing to instruct the jury that mental impairment evidence could be considered when assessing Duarte's credibility and consciousness of guilt; (5) the court erred by not mentioning premeditation and deliberation in CALCRIM No. 252; (6) the court erred in finding the victim's statements to his relatives were admissible under the dying declaration exception to the hearsay rule; and (7) reversal is required because the six alleged errors were cumulatively prejudicial. We affirm.

# PROCEDURAL BACKGROUND

The Los Angeles County District Attorney filed an information charging Duarte with murder (Pen. Code,[1] § 187, subd. (a); count one) and fleeing a pursuing peace officer's motor vehicle while driving recklessly (Veh. Code, § 2800.2; count two).

---

1      All further undesignated statutory references are to the Penal Code.

The information further alleged Duarte personally and intentionally discharged a firearm in the commission of the murder. (§ 12022.53, subd. (d).)

At Duarte's first trial, a jury convicted him of recklessly fleeing the police, but the court declared a mistrial on the murder charge after the jury was unable to reach a unanimous verdict. At Duarte's second trial, the jury found him guilty of murder and found true the firearm allegation. The court sentenced Duarte to 25 years to life for the murder conviction, and an additional 25 years to life for the firearm enhancement, for a total term of 50 years to life in state prison. The court imposed a concurrent 16-month low term for the Vehicle Code violation. Duarte timely appealed.

## FACTUAL BACKGROUND

### I.     Prosecution case

In June 2015 Duarte and his wife, J.S., were separated and lived apart due to marital problems. J.S. lived with her parents and Duarte with his sister. At the time, Duarte drove a red Mustang. J.S. spent the evening of June 13, 2015, with Duarte at his sister's house. While there, J.S. received text messages from the victim, Marco Puga, who wanted to see her that evening.[2] J.S. initially told Puga no, but then changed her mind and left Duarte's sister's house at around 10:00 or 11:00 p.m.

J.S. drove to San Pedro and met Puga at a Rite Aid so he could buy beer. J.S. and Puga then spent the night together

---

2     Unbeknownst to Duarte, J.S. and Puga had been having a relationship for several months.

3

driving around in J.S.'s SUV. Between 7:00 a.m. and 8:00 a.m. the next morning (June 14, 2015), Duarte received a telephone call from J.S.'s mother, who said J.S. had been out all night and not come home.

Around 8:00 a.m., J.S. dropped off Puga at a blue or black Mercedes parked near the intersection of 20th Street and Meyler Street in San Pedro. As Puga loaded some items from J.S.'s SUV into the trunk of the Mercedes, J.S. spotted Duarte's red Mustang driving in their direction. Fearing a confrontation, J.S. told Puga, "This is what I was trying to avoid." As she drove away, she saw Duarte park his Mustang near an alley, exit the car, and walk toward Puga. Puga was standing at the back of the Mercedes with its trunk open.

At about 8:00 a.m., residents in the area heard gunshots. M.O., who was watching television, heard three gunshots. When she opened her front door to investigate, she observed a man firing a small silver handgun. M.O. then looked out of her kitchen window and saw the gunman chase another man around a parked silver car while firing the handgun at him. The man holding the gun was cursing. M.O. did not see the other man attack the gunman in any way. As the man with the gun walked towards a red convertible with a black top, he slipped the gun into his pocket. M.O. wrote down the license plate number as the gunman drove off in the red convertible.

M.O.'s neighbor, J.R., also peered out of his window after hearing three gunshots. From a distance of about 20 feet, J.R. saw a younger man (Puga) crouched down on the curbside, by the passenger door of a parked silver Mercedes. An older man (Duarte) was on the street side of the car with a gun in his hand.

4

Duarte's arm was up and he was trying to shoot over the car's roof at Puga. Duarte fired the gun at least three times.

According to J.R., the younger man had nothing in his hands. As Duarte moved from the front to the back of the car, the younger man moved in the opposite direction, using the car to shield himself from the gunfire. J.R. heard the younger man yell, "She's my homegirl. She's my homegirl." According to J.R., Duarte continued shooting at the younger man until his gun was out of bullets, then he got in his Mustang and drove away. J.R. never saw the victim holding a gun, knife, or any other weapon. The younger man got into the Mercedes and sped away from the scene. The next day, J.R. identified Duarte from a photographic lineup as the shooter. He again identified Duarte as the shooter at trial.

Shortly after 8:00 a.m., Puga arrived outside his relatives' house a couple of blocks from the scene of the shooting. Puga's relatives were awakened by his screaming, "I got shot! I got shot!" While lying on his uncle's car, Puga told the relatives he got shot in the neck, was unable to breathe, and was not going to make it. Although the relatives initially did not see any injuries or blood on Puga, he eventually started to bleed from his mouth. When one of his cousins asked Puga who shot him, Puga answered, "Jackie's man." When asked why the man shot him, Puga said, "He didn't want to fight, and he just shot me." Puga screamed he was going to die. Puga's relatives called 911, and paramedics transported him to the hospital where he died from two gunshot wounds, one to the left chest and one through the left back.[3]

---

3       Toxicology tests established Puga had a blood alcohol content of 0.14 percent, a methamphetamine blood level of 1.3

About 10 minutes after J.S. drove away from Puga, she received a phone call from Duarte, but she did not answer. Duarte left a voice mail message, saying "I'm about it, mother [expletive]. I'm about it."

The police located Duarte's red Mustang in the parking lot of the Bestall Inn in Lomita. When Duarte left the hotel in the Mustang, LAPD officers attempted to stop the car and take Duarte into custody. Duarte fled and a high-speed pursuit ensued. It ended in the parking lot of the LAPD Harbor Station, where Duarte was taken into police custody.[4]

## II.     Defense case

Duarte testified in his defense as follows. According to Duarte, Puga was a member of the Rancho San Pedro Street

---

microgram per milliliter, and an amphetamine blood level of 0.13 microgram per milliliter.

4      In his first trial, Duarte was convicted of fleeing a pursuing peace officer's vehicle while driving recklessly (Veh. Code, § 2800.2; count two). The evidence introduced during the first trial showed that in the afternoon on June 14, 2015, LAPD Officer Robert Bechto, who was driving a marked patrol vehicle, pulled up behind the Mustang driven by Duarte and activated the emergency lights and sirens to stop the Mustang and take Duarte into custody. Duarte failed to yield and fled in his car with the officer pursuing in his patrol vehicle. During the pursuit, Duarte violated numerous sections of the Vehicle Code by driving on the wrong side of the road, failing to yield when entering a highway, making a right turn from an improper lane position, driving through a red light, failing to stop at a stop sign, and driving at unsafe speeds sometimes exceeding 100 m.p.h.

gang. Puga told Duarte about his gang membership on three occasions. Puga told Duarte, "Just remember this is my neighborhood. You know where you stand. You know where you're at." On one occasion Puga wanted to fight Duarte in an alley. He put his hand in his pocket, which made Duarte think he was carrying something. Because of this, Duarte did not want to fight Puga. Puga also "mad-dog[ged]" Duarte and gave him dirty looks. Puga challenged Duarte to a fight on two occasions. Whenever Duarte asked Puga why he was spending time with J.S., Puga said they were friends and that J.S. was his "homegirl." This made Duarte feel sad and hurt.

On June 13, 2015, Duarte saw a hickey on J.S.'s neck and asked her about it. J.S. said she had burned herself with a curling iron, and Duarte believed her. While at the beach with Duarte's family, Duarte told J.S. he wanted them to spend the night at a hotel. J.S. said she was too tired, and that they could spend the next day together. They all drove home, and Duarte spent the night at his sister's house in Wilmington.

The following morning, Duarte received a telephone call from J.S.'s mother at around 7:00 a.m. or 8:00 a.m. She told Duarte that J.S. had not returned home the previous night and asked when she left his sister's house. This made Duarte sad and he went to go look for her. At the time, he had a "red-orange" Mustang. There was a loaded gun in the glove compartment, which had been there for a few days. Duarte tried to call J.S. three or four times but she did not answer.

Duarte drove to J.S.'s parents' house. J.S.'s car was not there, so he drove around the block. He saw J.S.'s car on 20th and Meyler. He parked and took the gun out of the glove compartment. He put the gun in his pocket as he got out and

7

began walking to her car. Duarte brought the gun because it was early, he was looking for his wife, and her car was next to a park. As he got close to the car, it drove away. Duarte saw Puga on the sidewalk walking toward him. Puga "was in fast pace and was arguing." Puga walked near the trunk of a grey Mercedes and said something like "You're going to know what I'm about right now. You're going to find out." Puga reached into the trunk, grabbed a shotgun, racked it, and told Duarte this "was the end for [him]." Duarte grabbed his gun from his pocket and pointed it at Puga to scare him. The gun's safety was on. Duarte tried to talk to Puga but "he wasn't having it." The men were about 20 feet apart. Puga asked Duarte how he felt about him making J.S. his lover. At that point Duarte took the safety off his gun and fired a shot in the air. Duarte was on the driver's side of the car and Puga was on the passenger's side. Puga was pointing the shotgun at Duarte and then came "straight forward towards [Duarte] . . . like full paced, like, running towards [him]." Duarte fired a second shot. His intent was to scare Puga and he did not mean to hit him. Puga continued to advance toward Duarte, so Duarte fired a third shot. Both men then returned to their cars and left. Duarte did not see any blood on Puga. He did not think any of the shots hit Puga.

Duarte drove to his sister's house. He called J.S. and told her what happened. He then went to a swap meet. Duarte eventually went to the Bestall Motel in Lomita because he was tired. He was involved in a police chase that ended at the Harbor Police Station.

On cross-examination, Duarte testified he always kept his gun loaded. Duarte admitted he initially told Detective Coffee he did not see J.S. or Puga on June 14, 2015. He also told Detective

8

Coffee he did not own a gun. Duarte admitted he never told police the version of events he testified to on direct examination.

Dr. Jody Ward, a forensic psychologist, testified Duarte's IQ test revealed he was mildly developmentally disabled. Dr. Ward testified that in light of his intellectual deficits, Duarte would have difficulty controlling his behavior in complex situations in which he was overwhelmed.

## DISCUSSION

### I. Duarte's argument that the trial court erred by not instructing the jury on the lesser included offense of imperfect self-defense voluntary manslaughter

Duarte first contends the trial court prejudicially erred by refusing the defense request for a jury instruction on imperfect self-defense voluntary manslaughter. The Attorney General argues the court properly declined to give the instruction because there was no evidence Duarte acted under an actual but *unreasonable* belief that he was in imminent danger of great bodily injury or death. The Attorney General also contends that even assuming the trial court erred, the error was harmless. We agree with the Attorney General.

### A. Background

When discussing which jury instructions would be given, the court addressed CALCRIM No. 571, the instruction on

voluntary manslaughter based on imperfect self-defense.[5] In discussing this instruction, the court stated: "I don't get how this could be imperfect self-defense. When a guy is pointing a shotgun at you, you have an absolute right to shoot back, and – and it's – there's not an unreasonable belief to think that it wasn't [sic] loaded." The court further stated, "Anybody who points a gun, you have the right to shoot back. So it seems to me that this is not an imperfect self-defense case in any way." The court noted that an imperfect self-defense instruction would have been appropriate if Duarte had testified he thought a shotgun was in the trunk, "but once he testifies he . . . saw a shotgun pointed at him, I don't see how imperfect falls into play." The court noted defense counsel's objection for the record and excluded CALCRIM No. 571.[6]

---

[5]     CALCRIM No. 571 states: [¶] "The defendant acted in [imperfect self-defense] if: [¶] 1. The defendant actually believed that [he] was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those beliefs was unreasonable."

[6]     It appears even Duarte's attorney expressed doubts about whether the instruction was warranted. When asked whether she was requesting the instruction, she stated: "Well, in a perfect world, I would love this to be given, and in a perfect world, the testimony would not have been a surprise to us at the last minute. So I will submit."

## B. Applicable law

"An instance of imperfect self-defense occurs when a defendant acts in the actual but unreasonable belief that he or she is in imminent danger of great bodily injury or death. [Citation.]" (*People v. Simon* (2016) 1 Cal.5th 98, 132 (*Simon*).) "Imperfect self-defense differs from complete self-defense, which requires not only an honest but also a reasonable belief of the need to defend oneself. [Citation.]" (*Ibid.*) "It is well established that imperfect self-defense is not an affirmative defense. [Citation.]" (*Ibid.*) "It is instead a shorthand way of describing one form of voluntary manslaughter. [Citation.]" (*Ibid.*) "Because imperfect self-defense reduces an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice, this form of voluntary manslaughter is considered a lesser and necessarily included offense of murder. [Citation.]" (*Ibid.*)

"A trial court has a sua sponte duty to instruct the jury on a lesser included uncharged offense if there is substantial evidence that would absolve the defendant from guilt of the greater, but not the lesser, offense. [Citation.]" (*Simon, supra*, 1 Cal.5th at p. 132.) "'Substantial evidence' . . . is '"evidence from which a jury composed of reasonable persons could conclude[ ]"' the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).) "[J]ust because a trial court instructs a jury on perfect self-defense, this does not necessarily mean it has a sua sponte duty to instruct on imperfect self-defense." (*People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1254-1255, italics omitted.) Where "the defendant's version of events, if believed,

11

establishes actual self-defense, while the prosecution's version, if believed, negates both actual and imperfect self-defense, the court is not required to give the [imperfect self-defense] instruction. [Citation.]" (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 834 (*Szadziewicz*), disapproved on another ground in *People v. Dalton* (2019) 7 Cal.5th 166, 214.)

### C. Analysis

Duarte argues the trial court erred by not instructing on imperfect self-defense voluntary manslaughter because substantial evidence supported a finding that he committed the lesser crime but not the greater crime. (See *Breverman*, *supra*, 19 Cal.4th at p. 162.) We are not persuaded. The prosecution's position at trial was Puga was unarmed and Duarte murdered him. The defense's position, supported by Duarte's testimony, was that Duarte killed Puga in complete self-defense when Puga reached into his Mercedes, grabbed a shotgun, racked it, and stated this "was the end for [Duarte]" as he pointed the shotgun at him. Although Duarte's testimony supported an instruction on reasonable self-defense, it did not support an instruction on unreasonable self-defense. The trial court's decision not to give the instruction was therefore legally correct. (See *Szadziewicz*, *supra*, 161 Cal.App.4th at p. 834.)

Because we conclude the trial court did not err in its decision to omit the unreasonable self-defense voluntary manslaughter instruction, we need not address prejudice. We do note, however, that because substantial evidence did not support a conclusion that Duarte engaged in unreasonable self-defense (the evidence showed Duarte committed either murder or

engaged in reasonable self-defense), it follows logically that the failure to give an instruction on the theory would have been harmless under both *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705] (*Chapman*) and *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).

### II. Duarte's argument that the jury instructions on self-defense and sudden quarrel/heat of passion voluntary manslaughter were incomplete and misleading

Duarte next contends the instructions were prejudicially incomplete and misleading because they did not include language concerning "the right to defend against assault with hands or fists and the right to use a deadly weapon in response to such crimes," did not include the definitions of assault and battery, and did not instruct the jury that "actual danger is not necessary to justify self-defense." The Attorney General argues Duarte forfeited this argument by failing to object in the trial court, and even assuming the argument has not been forfeited, the trial court did not err and there was no prejudice. As discussed below, we reach the merits of Duarte's argument, but conclude the trial court did not err and there was no prejudice.

We first address forfeiture. Duarte acknowledges he did not object in the trial court on the grounds now raised on appeal. Although he did not object, Duarte contends his argument is cognizable on appeal because the omission affected his substantial rights. (See § 1259.)[7] "'Ascertaining whether claimed

_____

7    Section 1259 states in full: "Upon an appeal taken by the defendant, the appellate court may, without exception having

13

instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.) We therefore address the merits of the argument, as the question of forfeiture turns on whether the purported error was prejudicial. We also reach the merits of the argument in the interest of judicial economy, in order to forestall a petition for writ of habeas corpus raising an ineffective assistance of counsel claim. (See *People v. Lewis* (1990) 50 Cal.3d 262, 282 (*Lewis*).)

Turning to the merits of Duarte's argument, we conclude the trial court did not err. "'A trial court has a duty to instruct the jury "sua sponte on general principles which are closely and openly connected with the facts before the court." [Citation.]'" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.) Here, there was no evidence Puga attempted to assault or batter Duarte with his fists. As discussed above, the prosecution evidence showed Duarte approached Puga and shot him, whereas Duarte testified he shot in self-defense after Puga pointed a shotgun at him. Assault and battery instructions had no connection to the facts before the court and were not warranted.

---

been taken in the trial court, review any question of law involved in any ruling, order, instruction, or thing whatsoever said or done at the trial or prior to or after judgment, which thing was said or done after objection made in and considered by the lower court, and which affected the substantial rights of the defendant. The appellate court may also review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."

We likewise reject Duarte's claim that "the trial court should have instructed the jury that actual danger is not necessary to justify self-defense." The court instructed the jury using CALCRIM No. 505 ("Justifiable Homicide: Self Defense or Defense of Another"), which states, in pertinent part: "If the defendant's beliefs were reasonable, the danger does not need to have actually existed."

Because the record contains no evidence Puga attempted to assault or batter Duarte with his fists, the trial court's failure to instruct on these concepts was harmless under both *Chapman*, *supra*, 386 U.S. at p. 24, and *Watson*, *supra*, 46 Cal.2d at p. 836. These instructions would have been irrelevant to the jury's considerations.[8]

### III. Duarte's argument regarding the mental defect instruction[9]

Duarte next contends the trial court prejudicially erred by not instructing the jury it could consider the evidence of his

---

8       Similarly, because the court *did* instruct the jury that actual danger is not necessary to justify self-defense, there was no prejudicial failure to articulate this concept to the jury as Duarte contends.

9       Arguments III through V all allege instructional error. Although Duarte did not object in the trial court on any of the grounds raised in these arguments, we reach the merits of each in the interest of judicial economy to forestall a petition for writ of habeas corpus raising ineffective assistance of counsel. (See *Lewis*, *supra*, 50 Cal.3d at p. 282.) As a result, we omit any discussion concerning forfeiture.

mental defect in relation to whether he harbored the mental states of premeditation and deliberation.[10] Even assuming the trial court erred in this regard, we find the purported error harmless under any prejudice standard. The jury was instructed on mental defect as a way to not find malice aforethought. It is clear from the jury's verdict that it concluded the mental defect evidence was not credible enough to negate malice aforethought. There is no reason, based on the record presented, to think the jury would have found the mental defect evidence credible enough to negate premeditation or deliberation when it made the opposite finding on the element of malice aforethought. This is particularly true in light of the strong evidence showing premeditation and deliberation, which included prosecution witness testimony that Duarte shot Puga several times while he was unarmed.

## IV. Duarte's argument concerning the failure to instruct the jury that mental defect evidence could be considered when assessing Duarte's credibility

Duarte next argues the court prejudicially erred by not stating in the CALCRIM No. 3428 instruction that the mental impairment evidence could be considered when assessing

---

10    The trial court instructed the jury on mental impairment as a defense to specific intent or mental state using CALCRIM No. 3428. The court instructed the jury it could consider the evidence of his mental defect in relation only to whether he harbored the mental state of malice aforethought. The instruction did not state the jury could consider mental defect evidence in relation to whether Duarte premediated or deliberated.

Duarte's credibility and consciousness of guilt. We reject this contention. Duarte points to no testimony by Dr. Ward suggesting his mental defect might in any way impact his credibility or consciousness of guilt. Rather, the thrust of Dr. Ward's testimony was that Duarte's IQ test placed him in the mildly developmentally disabled range, and that in light of these intellectual deficits, he might have difficulty controlling his behavior in complex and overwhelming situations.[11] Because Dr. Ward did not testify Duarte's mental impairment might impact his credibility or consciousness of guilt, the trial court did not err by failing to instruct the jury that the mental defect evidence was relevant to the jury's assessment of these issues. (See *People v. Larsen* (2012) 205 Cal.App.4th 810, 823 ["'[A] trial judge must only give those instructions which are supported by substantial evidence[.]' . . . . [Citation.]"].) Additionally, because the instruction Duarte claims should have been given was not supported by substantial evidence, any purported error was harmless under both *Watson, supra*, 46 Cal.2d at p. 836, and *Chapman, supra*, 386 U.S. at p. 24.

## V. Duarte's argument regarding the instruction on the union of act and wrongful intent

We likewise reject Duarte's argument that the trial court prejudicially erred by not mentioning premeditation and

---

11     Dr. Ward also testified Duarte sees reality as a normal person would and is emotionally mature.

17

deliberation in CALCRIM No. 252.[12] The instruction the court provided explained that count one required "proof of the union, or joint operation, of an act and a wrongful intent[,]" and "the act and the specific intent or mental state required are explained later in the instructions for those crimes." The other instructions properly informed the jury of the applicable mental states for each crime, including premeditation and deliberation. In considering these instructions as a whole, we conclude the trial court properly instructed the jury. (See *People v. Guerra* (2006) 37 Cal.4th 1067, 1148-1149 disapproved on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151 ["In assessing whether the jury instructions given were erroneous, the reviewing court [ ] ""must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' [Citation.]"" [Citations.]"].) Even assuming the trial court erred, we conclude

12    The court instructed the jury as follows using CALCRIM No. 252: [¶] "The crime and allegation charged in Count 1 requires proof of the union, or joint operation, of act and wrongful intent. [¶] The following crime[s] require [ ] a specific intent or mental state: murder or manslaughter. For you to find a person guilty of [these] crimes, that person must not only intentionally commit the prohibited act, but must do so with a specific intent or mental state. *The act and the specific intent or mental state required are explained in the instruction for that crime.* [¶] The following allegation requires general criminal intent: the gun allegation. [T]hat person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he intentionally does a prohibited act; however, it is not required that he intend to break the law. The act required is explained in the instruction for that allegation." (Italics added.)

the purported error was harmless. Duarte has not sustained his burden of showing it was reasonably probable he would have received a more favorable outcome if CALCRIM No. 252 had explicitly mentioned premeditation and deliberation rather than referring the jury to the instructions detailing the legal principles relevant to homicide. (See *Watson*, *supra*, 46 Cal.2d at p. 836.) We would find the purported error harmless under *Chapman*, *supra*, 386 U.S. at p. 24, as well.

## VI.    Duarte's evidentiary argument

Duarte next contends the trial court prejudicially erred by allowing Puga's cousin to testify Puga's dying words were that Duarte shot him and did not want to fight him, statements the trial court held admissible under the dying declaration exception to the hearsay rule.[13] We conclude the trial court did not abuse its discretion. (See *People v. Mayo* (2006) 140 Cal.App.4th 535, 553 [abuse of discretion standard of review applies].)

"'To be admissible in evidence as dying declarations, the statements of the decedent must have been made at a time when he had abandoned all hope of life so that he believed that death inevitably must follow. This sense of impending death may be shown in any satisfactory mode, by the express language of the declarant, or be inspired from his evident danger, or the opinions of medical or other attendants stated to him, or from his conduct,

---

13    Evidence Code section 1242 states: "Evidence of a statement made by a dying person respecting the cause and circumstances of his death is not made inadmissible by the hearsay rule if the statement was made upon his personal knowledge and under a sense of immediately impending death."

or other circumstances in the case, all of which are resorted to in order to ascertain the state of the declarant's mind.'" (*People v. Tahl* (1967) 65 Cal.2d 719, 725.)

The evidence here demonstrated Puga knew he was dying. After arriving at his cousin's house, he said he had been shot in the neck, could not breathe, and was going to die. Simply put, Puga's statements to his cousin were dying declarations.

Even assuming the trial court erred by allowing the statements, Duarte has not sustained his burden of showing it was reasonably probable he would have received a more favorable outcome had the statements been excluded. (See *Watson*, *supra*, 46 Cal.2d at p. 836.) Although it is true Puga's statement to his cousin that Duarte did not want to fight bolstered the prosecution's position that Duarte shot Puga as he was unarmed, J.R., who witnessed the shooting, testified Puga was unarmed when Duarte shot him. In other words, the prosecution evidence on this point would have remained strong even if Puga's statements had been excluded.

## VII.   Duarte's cumulative error argument

Duarte lastly argues that even if the errors discussed in Arguments I through VI are deemed harmless individually, their cumulative effect prejudiced his right to a fair trial. We disagree and conclude Duarte received a fair trial. (See *People v. Price* (1991) 1 Cal.4th 324, 465 [defendant does not suffer substantial prejudice when few or no errors occurred and all alleged errors were individually deemed harmless].)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


CURREY, J.


We concur:


MANELLA, P.J.


COLLINS, J.